Philip Taylor and Gladys Taylor, et al., 1 v. Commissioner. Taylor v. CommissionerDocket Nos. 3899-63 - 3902-63.United States Tax CourtT.C. Memo 1966-29; 1966 Tax Ct. Memo LEXIS 252; 25 T.C.M. (CCH) 180; T.C.M. (RIA) 66029; February 14, 1966Philip Taylor, 177 Chiswick Rd., Boston, Mass., for the petitioners in Docket Nos. 3899-63 and 3900-63. Jack J. Moss, 85 Clifton St., Belmont, Mass., for the petitioners in Docket Nos. 3901-63 and 3902-63. Lawrence A. Wright, for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent determined deficiencies in the income tax against petitioners as follows: Docket No.PetitionerYearDeficiency3899-63Philip Taylor, et ux.1959$ 15,596.943900-63Philip Taylor19572,144.7419583,048.233901-63Jack J. Moss, et ux.195664,021.931957141.751958110,283.29195924,174.843902-63Middlesex Industrial Park, Inc.4/8/57 thru12/31/5751,164.601958268.96195976,242.87*253 The issues for decisions are as follows: (1) Whether petitioner Middlesex Industrial Park, Inc., hereinafter referred to as Middlesex, a Massachusetts corporation, carried on sufficient business activities during the taxable periods April 8, 1957 through December 31, 1957, 1958 and 1959 to constitute it a separate taxable entity; (2) whether certain distributions from Middlesex to Jack J. Moss and Philip Taylor, hereinafter referred to respectively as Moss and Taylor, in 1957, 1958 and 1959 were taxable to them as dividends; (3) whether sales of real estate made by petitioner Moss in the amounts of $225,126.20, $39,600, $231,000 and $46,228.26 in taxable years 1956, 1957, 1958, and 1959, respectively, were made in the ordinary course of his business, thereby giving rise to ordinary income; (4) whether certain mortgages received by Moss in each of the taxable years involved herein were taxable to him as ordinary income in the year they were received; and (5) whether the amount of $2,000 distributed to Moss by Spruce Hill Realty Trust in the taxable year 1959 was taxable income to him. Findings of Fact Some of the facts have been stipulated and are found accordingly. Jack J. *254 Moss and Sarah Moss are husband and wife residing at 85 Clifton Street, Belmont, Massachusetts. Moss is an attorney with a business office at 4 Federal Street, Woburn, Massachusetts, Sarah Moss is his wife. They filed their Federal income tax returns for the taxable years 1956, 1957, 1958 and 1959 with the district director of internal revenue for the district of Massachusetts. Philip Taylor and Gladys Taylor are husband and wife residing at 177 Chiswick Road, Brighton, Massachusetts. Philip Taylor filed his individual Federal income tax returns for the taxable years 1957 and 1958 with the district director of internal revenue for the district of Massachusetts. Philip and Gladys Taylor filed their joint Federal income tax return for the taxable year 1959 with the district director of internal revenue for the district of Massachusetts. Moss served on the town of Burlington, Massachusetts, Planning Board almost continuously for 15 years. He considered himself largely responsible for the rapid growth of the community from a population of 2,500 in 1955 to 18,000 at the time of trial. This growth began sometime in 1954 because of the advent of two superhighways. "Route 128," sometimes*255 referred to as the "Electronics Road of the World," and the then new Route 3. Moss was entitled to a deduction for capital losses on the sale of United States Treasury Bonds for the taxable year 1959. In that year he sustained a short-term loss of $18,662.03 and a long-term loss of $47,947. 2Taylor was entitled to additional deductions for interest paid in the taxable years 1958 and 1959 in the respective amounts of $1,482.64 and $3,876.63. 2The decisions of Moss to purchase some of the various pieces of real estate, sales of which are involved in this proceeding, were based primarily upon the inside knowledge of the rapid growth potential of the community which he gleaned from his positions as town counsel and a member of the Town Planning Board of Burlington. Most, if not all of the land involved in this proceeding was within the limits of the town of Burlington. Chapter 41, Section 81 U of the Annotated Laws of Massachusetts relating to planning boards and subdivision control provides, among other things, that a planning board, before approval of a plan, may require provision for the construction of ways and the installation of*256 municipal services in accordance with its rules and regulations and may require, as a condition of approval of a plan, that no lot be sold or building constructed until such ways are constructed and such services provided. The pertinent provisions of the Town of Burlington Planning Board Regulations provide generally that no land may be subdivided into lots without prior approval of the planning board. Section V.A. 7 of those regulations provides in part as follows: 7. Every applicant shall state in his application the approximate scheduled time within which the ways in the subdivision will be completed and the public utilities and other improvements required by the Board installed therein. * * * Middlesex Industrial Park Issues Middlesex Industrial Park, Inc., was organized and received a charter as a Massachusetts corporation on April 8, 1957. Its business office is the same as Moss' law office, which is located at 4 Federal Street, Woburn, Massachusetts, and it filed its Federal income tax returns for the taxable period beginning April 8, 1957 through August 31, 1957, and for the fiscal year ending August 31, 1958, 1959 and 1960, with the district director of internal revenue*257 for the district of Massachusetts. The agreement of association of Middlesex provided for 1,000 shares of no par value with a corporate life limited to 50 years. Its incorporators were Howard Taymor, Maurice Chadis and Zanad Pepoli. No stock was subscribed for at the time of incorporation. The duly elected officers were: Howard Taymor, president and director, Maurice Chadis, treasurer and director, Zanad Pepoli, clerk and director. 3Among the purposes for which the corporation was formed and the nature of the business to be transacted were stated as follows: To own, buy, sell, rent and exchange real or personal property; to build, construct and alter real property; to manage and develop real property; * * * to transact*258 a general real estate agency and brokerage business, including the management of estates; * * * On March 24, 1953, Moss purchased a tract of land containing approximately 70 acres for $50,000, consisting of a $10,000 down payment and a purchase price mortgage of $40,000 taken by the seller, one Raimondo. The deed to this land was taken in the name of R. & T. Company, Inc., as straw for Moss. This land was known as Connor's Piggery. On the same date, R. & T. Company, Inc., executed a second mortgage in the amount of $10,000 to Ruth Cerrone who was Moss' secretary. 4*259 On July 27, 1953, an agreement was entered into between Moss, Sarah Mogul 5 and Aaron J. Rosenberg providing for the sale of an one-third interest respectively to Mogul and Rosenberg in the Connor's Piggery land. The land was to be held by the three as tenants in common. The agreement provided or recited, among other things, that at the time of the agreement the Connor's Piggery land was owned by Moss with title in the name of R. & T. Company, Inc., as straw; that the land was subject to a $40,000 purchase price mortgage held by Raimondo and secured by a $40,000 promissory note given by Moss as security for the mortgage; that Moss held a second mortgage of $10,000 from R. & T. Company to Ruth Cerrone, his straw; that Mogul and Rosenberg were to pay Moss $3,812 6 each for their respective one-third interests; that Mogul and Rosenberg were to be personally liable with Moss to the extent of one-third each on the $40,000 note given by Moss as security for the first mortgage held by Raimondo, and that Moss would not call for payment of the $10,000 second mortgage held by Cerrone until the first mortgage had been paid and thereafter only upon receipt of proceeds from the sale of any*260 part of the Connor's Piggery land or of earthern material removed therefrom. Pursuant to this agreement, R. & T. Company, Inc., transferred the Connor's Piggery land to Moss, Rosenberg and Mogul for Levanthal. This transfer constituted a sale of a two-thirds interest in the land by Moss to Rosenberg and Leventhal. At some unknown date, Rosenberg and Leventhal had done some financing purportedly in connection with a sand plant on the Connor's Piggery property. Some dispute arose and litigation ensued which, in a manner not shown, resulted in an attachment or cloud on the title to the Piggery property owned after July 27, 1953 by Moss, Rosenberg and Leventhal as tenants in common. By reason of this fact, a decision was made to foreclose the second mortgage and in furtherance of this plan, Ruth Cerrone, Moss' secretary, assigned the second mortgage held by her to Taylor, who was to effect the foreclosure in order to get rid of the attachment or cloud on the property. Prior to*261 the carrying out of this plan, however, the three tenants in common entered into an agreement that if any one of the three was a successful bidder at the foreclosure sale by Taylor, the successful bidder would hold title to the property for all three. It was also agreed that the successful bidder would hold the property under the same terms as the original agreement of July 27, 1953. This included the giving by the parties of a second mortgage to Moss or his nominee under the same terms and conditions of the original agreement. Taylor instituted foreclosure proceedings on the second mortgage on February 21, 1955. On April 22, 1955 and May 2, 1955, he published notice of a mortgagee's sale of the Connor's Piggery property in the Woburn Daily Times. At the sale held on June 17, 1955, the land was purchased by Taylor for $10,500. A foreclosure deed of the property to Taylor was recorded in Middlesex South District Registry of Deeds on June 24, 1955. On June 27, 1955, Taylor executed an agreement that he held the Connor's Piggery property in trust for Moss, Rosenberg and Leventhal. On March 29, 1956, Taylor, trustee and record holder of the property, entered into an agreement with*262 one William Barnes for the sale of the land to Barnes for $66,000. This agreement was signed by Taylor and Barnes and assented to by Moss, Rosenberg and Leventhal. On or about April 1, 1956, or within approximately three days of the agreement between Taylor and Barnes for the sale of the Connor's Piggery land, Moss and Taylor entered into a partnership under the terms of which each was to receive 50 percent of the proceeds realized from the rental and sale of gravel from the Connor's Piggery land, and each would have a 50 percent interest in the property held by the partnership. On April 17, 1956, Barnes assigned to Taylor all of his rights, title and interest in the purchase agreement between himself and Taylor for the Connor's Piggery land. Pursuant to the agreement whereby Barnes agreed to buy and Taylor, as trustee for Moss, Rosenberg and Leventhal, agreed to sell the Connor's Piggery land, Rosenberg and Leventhal were furnished settlement sheets consummating the sale together with a check in the amount of $15,680.03 each, as their respective shares of the proceeds of the sale of real estate to Barnes. During the year 1956, Moss acquired one additional parcel of real estate*263 containing approximately 13.5 acres, known as the Mason land and situated adjacent to the property already held by the partners. The partnership in 1956 acquired a separate parcel consisting of approximately threequarters of one acre providing a right-of-way from Route 62 in Burlington, Massachusetts, known as the Sebastian land. On April 12, 1957, the Connor's Piggery land, now owned by the partnership and recorded in the name of Taylor, was transferred by him to petitioner Middlessex. No money was paid and no shares of stock were actually issued by Middlesex for the property. On April 27, 1957, an agreement was executed by Moss, Taylor and Middlesex, as sellers, and the Radio Corporation of America, hereinafter referred to as RCA, as buyer. In so far as appears, the agreement provided for the sale of certain of the Connor's Piggery acres with an option to buy others. 7On a date not definitely shown a bank account was opened for Middlesex with $2,000 supplied by Moss which was followed by the borrowing by Middlesex of $25,000 from the United States Trust Company*264 of Boston, Massachusetts, on June 28, 1957. 8The borrowing by Middlesex was evidenced by its note signed by Howard Taymor as president and Maurice Chadis as treasurer with Moss and Taylor as endorsers. On August 7, 1957, a deed was executed by Middlesex Industrial Park, Inc., transferring 35 acres of the Connor's Piggery land property to the Warrenton Corporation, a nominee of RCA, for $151,427.50. These funds were deposited in the Middlesex account and disbursements were made from this account in connection with this sale on the day of the sale. In connection with the sale of the 35 acres to RCA on June 18, 1957, there was recorded in the South Middlesex Registry of Deeds, Cambridge, Massachusetts, a certificate from the clerk of Middlesex of the minutes*265 of a meeting of said corporation held on June 18, 1957. Those corporate minutes provided, among other things, that Maurice Chadis, treasurer of the corporation, was authorized and empowered to do those things and carry out those activities enumerated in the corporate articles of agreement, including real estate transactions. On September 15, 1958, Middlesex received a check for $10,000 from RCA as a deposit on the remaining land owned by that corporation. On June 25, 1959, Middlesex received and deposited to its corporate checking account $125,000 as an additional deposit. This money was disbursed to Taylor and Moss. On June 25, 1959, a clerk's certificate was registered in the South Middlesex Registry of Deeds, disclosing Taylor to be the treasurer of Middlesex and reciting that he had been authorized to give a mortgage on all or part of the real property owned by Middlesex in connection with the sale of land to RCA. On June 25, 1959, a deed was recorded in the South Middlesex Registry of Deeds to 85 1/2 acres of land conveyed to Middlesex by Murray Hills, Inc.9*266 On September 23, 1959, Middlesex acquired approximately six or seven acres of registered land from the Highland Sand and Gravel Company. Middlesex executed and caused to be recorded a mortgage signed by Taylor as treasurer of the corporation and the sale of some 37.71 acres, 10 subject to this mortgage was completed by Middlesex to RCA on December 17, 1959. Gravel was sold from the lands held by Middlesex prior to the sales to RCA and monies from these sales were usually paid to Moss. In turn, he would deposit the funds in the account of Middlesex and "cut it up as funds accumulated." The division of funds was between Moss and Taylor. The evidence shows a number of statements of account showing sales ranging in amounts from $3.90 to $2,021.85. The following is a summary of the gravel sales by respective billing date and amount 11 and the cumulative total of the sales during the years 1957, 1958 and 1959: 2-25-57$ 304.202-11-57256.509- 9-57276.8010- 2-5717.553-12-57101.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.206-17-583.904-25-58393.754-11-58974.8512-15-592,021.8512- 1-59488.5011-24-59834.3011-13-59719.0510-14-59787.159-30-591,579.455-25-59361.254-29-59349.604-29-59465.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.35Total$10,120.25*267 In addition to the Murray Hills and Highland Sand and Gravel Company land held by Middlesex, it also held title to a small sliver of land which was a leftover from its sales to RCA. These three pieces of land were held by Middlesex until shortly before trial. At all times during the taxable years Middlesex was a subsisting corporate entity engaged in various of the purposes enumerated in its agreement of association. Among these were the purchase and sale of real property and the sale of gravel found on lands held in its corporate name. Opinion The issues of whether Middlesex should be regarded as a separate taxable entity during the period from April 8, 1957 through December 31, 1959, and whether the respective distributions by it during those years were taxable to petitioners Moss and Taylor as dividends depend on whether or*268 not Middlesex is to be regarded as a subsisting corporate entity for tax purposes or a mere conduit for the passage of title. Petitioners Moss and Taylor 12 take the position that amounts received by them from land sold to RCA or its nominee in 1957 and 1959 were properly treated as long-term capital gains under section 1221 of the Internal Revenue Code of 1954. That section defines "capital asset" generally as property held by the taxpayer with certain exceptions. Among the excepted items are property includible in inventory at the close of the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. 13*269 Moss and Taylor argue that by attributing sales of land to RCA as having been made by Middlesex rather than themselves, respondent has chosen to disregard the substance of the transactions. They claim that this position is inconsistent and in conflict with respondent's earlier recognition with respect to other properties sold; that although Moss acquired properties in the name of straws, he was the true seller in each instance. Specific reference is made to transactions involving the same land with R. & T. Company as nominee. The position of Moss and Taylor is that Middlesex was a corporation in form only - a mere conduit for the passage of title - and that sales made to RCA were properly attributable to the partnership of Moss and Taylor on a long-term capital gains basis. It is their further assertion that the focal question is whether or not the sales of land to RCA were in fact made by them and not Middlesex, irrespective of the status of Middlesex as a subsisting corporate entity. Petitioners rely primarily upon Commissioner v. Court Holding Co., 324 U.S. 331 (1945); United States v. Cumberland Public Service Co., 338 U.S. 451 (1950) and S. Nicholas Jacobs, 21 T.C. 165 (1953),*270 affd. 224 F. 2d 412 (C.A. 9, 1955). As to the second issue, it is their contention that if it is determined that they were in fact the sellers of the land to RCA, it follows that the realization of the proceeds would not constitute dividend distributions to them from Middlesex. Respondent takes the position that Middlesex was a subsisting corporate entity organized and chartered under applicable state law, and that it carried on sufficient business activities during the taxable years to constitute a separate entity for tax purposes. It is further claimed that if this determination is made, distributions from Middlesex of the proceeds from the various real estate transactions and gravel sales must be considered as dividend income to Moss and Taylor in the years of distribution. Alternatively, respondent argues that the association of Moss with Taylor to do business as Middlesex possesses the requisite characteristics for taxation as a corporation under the definition in section 7701 of the 1954 Code and applicable regulations thereunder. Among other things, section 7701 states that the term "corporation" includes associations and Reg. 301.7701-2(a) delimits the*271 various characteristics which require an association to be classified as a corporation for tax purposes rather than as another type of organization. 14In support of his position, respondent relies primarily upon Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943);*272 Burnet v. Commonwealth Improvement Co., 287 U.S. 415 (1932) and related cases. Also in issue is the incidental question of an alleged profit of $9,835.82 determined by respondent in his notice of deficiency and allegedly realized by Moss as a result of the sale in 1956 of the Connor's Piggery land by Taylor as trustee for Moss, Leventhal and Rosenberg to one William Barnes. At the time of the sale, Barnes had previously assigned all of his rights in the purchase agreement to Taylor. Respondent does not argue this point on brief, apparently relying on the presumption of correctness alone. However, there is no indication in the record that Moss actually sold his one-third share in the property or that he received any money at settlement. The facts indicate that Moss and Taylor provided the funds for the settlement payments to Rosenberg and Leventhal and then re-aligned their respective interests coequally. The effect of the transaction was that Moss and Taylor bought out Rosenberg and Leventhal and thereafter held the Connor's Piggery land as partners. Consequently, we hold for petitioner Moss on this issue. As to the Middlesex issues we are unable to agree with petitioners*273 Moss and Taylor that the corporate entity of Middlesex was a sham or a mere agent for holding title. Nor do we find substance in their alternative contention since we are unable to conclude that Moss and Taylor exclusive of Middlesex were sellers of Connor's Piggery land to RCA. True they were listed in the April 27, 1957, contract as sellers but so was Middlesex, the property involved having previously been transferred to Middlesex by Taylor who had been holding it for Moss and himself. The facts show that Moss and Taylor ignored Middlesex as a corporate entity when it suited their purposes but they remained at all times under its protective shelter and availed themselves of all the advantages provided by the corporate business form. Consequently, we do not think it follows from the disregard of the corporate form for personal convenience that the corporation may be disregarded for tax purposes. The facts show, and we have found, that Middlesex was a subsisting corporate entity engaged in various activities designed to effectuate the purposes enumerated in its agreement of association at all times during the taxable years in issue. It held title to various parcels of land, executed*274 buy-sell agreements and deeds to land, held an active checking account into which funds were deposited and from which funds were disbursed, held corporate meetings and filed minutes of those meetings in the South Middlesex Registry of Deeds, borrowed money on at least one occasion in the amount of $25,000, engaged in the sale of gravel from lands held by it to various persons over a three-year period, executed a mortgage and held itself out to be a subsisting entity for all those purposes and secured to itself all those advantages of the corporate business form. For these reasons, we cannot ignore Middlesex as a corporate entity for Federal income tax purposes. Under Moline Properties, Inc., supra, parties who choose to avail themselves of the advantages of holding title and transacting business in corporate form cannot escape the income tax disadvantages of that choice. As stated by the Court at 438 and 439: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or comply with the demands of creditors or to serve the creator's personal or undisclosed*275 convenience so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 442; Deputy v. du Pont, 308 U.S. 488, 494. *We think this case is governed by Moline Properties, Inc., supra. And, we are not moved by the argument that respondent has been inconsistent in his treatment of R. & T. Company as compared with Middlesex. In so far as appears, R. & T. Company was in the picture only for a very short time, and while it was its activities, if any, were quite negligible. However, that may be, suffice it to say we do not have here the case of R. & T. Company nor is there before us any year in which R. & T. Company was in any way connected with the subject matter of the transactions with which we are concerned. Petitioner's reliance on Commissioner v. Court Holding Co., supra; United States v. Cumberland Public Service Co., supra; and S. Nicholas Jacobs, supra, does not lead us to a contrary result. *276 Actually the reasoning advanced in the Court Holding Co. case leads us to the same result and for the same reasons. Briefly, the reasoning there is that the means employed to transfer legal title upon a sale of property are not necessarily determinative of the tax consequences which attach to that sale - the transaction must be viewed as a whole with each step being relevant. The incidence of the taxation depends upon the substance of a transaction and the duty of determining the factual category in which a particular transaction belongs rests with the trial court in the first instance, consideration being given to the entire transaction. Commissioner v. Court Holding Co., supra.See and compare United States v. Cumberland Public Service Co., 338 U.S. 451 (1950). See also National Carbide Corporation v. Commissioner, 336 U.S. 422. S. Nicholas Jacobs, supra, is distinguishable on its facts. There the taxpayer reactivated a dormant corporation, conveyed land to it in exchange for its stock, and later sold all of the stock to a newly formed corporation owned by a person who wished to purchase the land. The Court found as a matter*277 of fact that the corporation had not entered into any business transaction of any kind and concluded that the various steps were parts of a single transaction whereby the taxpayer effected a sale of land. Here, however, we have found that Middlesex served a number of business purposes and performed a number of business functions, all of which proved to be of great monetary advantage to petitioners Moss and Taylor. We are convinced and have found, that Middlesex went beyond the mere function of acting as a conduit to transfer title to land and that the substance of these transactions falls within the rule in Moline Properties, Inc., supra.As stated above, our conclusion would not be different under Court Holding, supra. As in Moline, petitioners Moss and Taylor availed themselves of the advantages of holding title and transacting business in corporate form and cannot now escape the income tax disadvantages of that choice. Consequently, we hold that Middlesex was a subsisting corporate entity which carried on sufficient business activities during the taxable years to constitute a separate entity for tax purposes and that distribution from Middlesex of the*278 proceeds from the various real estate transactions and gravel sales was income to Moss and Taylor in the years of distribution. We need not reach respondent's alternative argument. Other Properties Sold During the Taxable Years During the taxable years, petitioner Moss bought and sold a number of properties, some of which were acquired prior to the years in issue and others during those same years. Sales were made variously on a lot basis, acreage, and lots and tracts with options to buy others. Some of those sales were incident to or a part of real estate developments. On December 10, 1954, Moss purchased land on Cambridge Street, Burlington, Massachusetts, which was operated as a small gas station and took title in the name of Howard S. Cosgrove. Thereafter, title was transferred by Moss to Taylor, his straw, and on May 1, 1956, the premises were leased to Algiero Tombion and the premises sold by Taylor to the lessee in 1956. The Tombion property was held by petitioner Moss primarily for investment purposes. The area known as Wood Hill constituted a tract of 214 acres of undeveloped land in Burlington, Massachusetts, and was assembled by Moss by purchases through straws*279 over a period of years beginning December 20, 1943 and extending to April 5, 1954, as follows: PurchasedAcres194328194515194680194720195471 Titles to the land making up the entire tract were eventually transferred by petitioner Moss and his straws to Dasal Corporation. Dasal Corporation, hereinafter referred to as Dasal, was organized under the General Laws of Massachusetts on September 19, 1947, with its principal office located at Boston, Massachusetts. Its agreement of association provides for 1,000 shares of no par value with a corporate life limited to 50 years. The names and residences of the incorporators and the amount of stock subscribed for by each is as follows: Amount Subscribed ForNameResidencePreferredCommonAdolph Teitelbaum177 Chiswick Road01Brighton, Mass.Sarah MossWinn Street098Burlington, Mass.Bernard L. Grossman20 A Waumbeck St.01Roxbury, Mass.On October 8, 1951, Dasal received a permit from the Town of Burlington to level off the Wood Hill area and sell fill and gravel therefrom. 15*280 On October 25, 1954, an agreement was made by Dasal to sell ten of the lots of the Wood Hill land to Kenny Builders, Inc., with a purchase option for the remaining lots and tracts of land on a lot basis. The agreement provides, among other things, as follows: This option is to continue for a period of five (5) years from the date of this agreement provided that the BUYER buys a total of fifty (50) lots in the calendar years 1954 and 1955, and fifty (50) lots in each succeeding calendar year, and further provided BUYER substantially commences the construction of ten (10) houses on said lots by January 1, 1955. The agreement and option to purchase were extended for a period of five years from the date of the original agreement on December 23, 1955. The extension of the option is phrased in substantially the same terms as the original agreement. On June 7, 1957, Kenny Builders, Inc., signed a release of its option. On September 10, 1956, the Wood Hill land was transferred by Dasal to Taylor, the brother of petitioner Sarah Moss, as a straw. On November 15, 1958, an agreement was made between Taylor and Leeland Construction Co., Inc., for the sale of 206 acres of the Wood Hill*281 land held in his name. Pursuant to said agreement, the land was conveyed to Leeland Construction Co., Inc., and Taylor took a mortgage to secure the payment of $199,415. Among other clauses, the mortgage provided as follows: The mortgagee hereby agrees for himself and his assignees to release from the within mortgage such lot or lots as the mortgagor or his successors in title may request, upon payment to the holder hereof of the sum of four hundred and fifty dollars for each lot released together with such interest on this mortgage as shall have accrued to the date of such release. The Prouty Heights development consisted of a tract of 15 acres of undeveloped land situated across the road from the Wood Hill tract and was purchased on April 30, 1956, from one Butterworth by Moss with title in the name of Taylor. On October 30, 1956, an agreement was made with Northern Building Corporation by Taylor for Moss for the purchase of this land at a sales price of $52,925. Pursuant to this agreement, a deed and mortgage from Northern Building Corporation to Moss were executed on December 17, 1956, and delivered and recorded on January 8, 1957. The agreement and mortgage show that*282 the land was sold on a lot basis and provided, among other things, that the seller mortgagee would prepare the roads in accordance with the Burlington Planning Board specifications and obtain a release from the Board, install hot top on roads adjacent to lots designated by the buyer mortgagor, install drainage, water mains and hydrants for the lots in accordance with the plan filed with the Burlington Planning Board and applicable public authority. The area known as the Sherwood Forest development consisted of two tracts of undeveloped, contiguous land and adjoined the area known as Wood Hill. Forty acres of this land were purchased by Moss through Taylor on April 10, 1955, from one Raditsis, formerly Avramides. The other portion of thirty acres was purchased on September 19, 1955, from Ruth Nicoll, the straw of Kenneth MacIver, by Taylor as straw for Moss. On July 18, 1956, Moss entered into an agreement with one Redmond for the sale of a portion of the Sherwood Forest land. On August 16, 1956, two lots were deeded to Redmond and a mortgage taken back by Moss. The agreement included an option to purchase the remainder of the land on a lot basis. The agreement also provided that*283 the seller would complete the development of the roads for the lots, the hot top and the installation of water hydrants in accordance with the specifications of the Burlington Planning Board. On November 2, 1956, the balance of the land under the agreement was deeded to Redmond and a mortgage taken back by Moss. Among other paragraphs the mortgage provided in part as follows: Mortgagee agrees to give to mortgagor herein a partial release for any or all of the lots aforementioned except lots * * * (certain numbered lots excluded) upon receipt of the sum of ONE THOUSAND DOLLARS ($1,000.00) together with any interest that may be due, apportioned amongst the several lots and agrees to take back a second mortgage for the balance due and payable on or before December 31, 1957 with interest at 4% per annum payable at the end of the term and mortgagee to discharge his first or second mortgage, as the case may be, for each individual lot that is fully paid for at the rate of ONE THOUSAND EIGHT HUNDRED DOLLARS ($1,800.00) per lot together with any accumulated interest due on that amount. As to the remainder of the Sherwood Forest tract, Moss through Taylor made an agreement to sell this*284 remaining tract to G. Ciardiello & Sons, Inc. The agreement provided for the initial sale of several lots with an option to purchase any or all of the remaining lots. Some specified lots were excepted from the agreement. The agreement provided that the seller would complete the installation of the water mains and hydrants and the hot top for the roads, as required by the Burlington Planning Board. On November 21, 1956, Ciardiello took title to a portion of the land and gave back a mortgage to Moss. Among other provisions, the mortgage provided in part as follows: Mortgagee agrees to give partial releases under this mortgage upon receipt of SEVEN HUNDRED DOLLARS ($700.00) together with accumulated interest for each lot and mortgagor agrees to give mortgagee a second mortgage for the balance of EIGHT HUNDRED DOLLARS ($800.00) that may be due together with accumulated interest on each of said lots so as to permit mortgagor to place construction mortgages on the lots. On May 10, 1957, additional lots were conveyed to Ciardiello by Moss through his straw, and a second mortgage given to Moss. However, Ciardiello defaulted on the mortgage, and suit was brought by Moss. During the*285 taxable years involved, Moss' gross sales from real estate transactions involving the Sherwood Forest, Prouty Heights and Wood Hill lands was approximately $486,837, while his net profit from those same transactions was approximately $281,814. Moss' returns for the taxable years show gross income from his law practice of $59,851.78, for a net loss of $83,393.13 16 for these years. At all times during and after the year 1954, petitioner Moss was actively engaged in the buying and selling of real estate in the ordinary course of his business. Opinion It is Moss' position that all of the real estate transactions in which he engaged during the taxable years were sales of land which he held as an investment at the time of the sale, and that the profits therefrom were, in each instance, properly reported as long-term capital gains under section 1221 of the Internal Revenue Code of 1954. Moss takes the further position that mortgages taken in conjunction with the sale of the Sherwood*286 Forest, Prouty Heights and Wood Hill lands are not the equivalent of cash and that such income was properly reported when received as long-term capital gain pursuant to a deferred payment plan. Moss also seeks to value the second mortgages received in part payment on the sale of Prouty Heights and Sherwood Forest by ascribing to their worth a zero valuation. Respondent claims that sales of real estate by Moss in the amounts of $225,126.20, $39,600, $231,000 and $46,228.26 in taxable years 1956, 1957, 1958, and 1959, respectively, were made in the ordinary course of his real estate business and therefore constitute ordinary income, since they do not come under the definition of "capital asset" in section 1221 of the 1954 Code. There are numerous cases dealing with the question of whether real property is held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business and, as we have often stated, the determination of this question must ultimately rest upon a consideration of the facts in the particular case. Among factors which bear on the outcome are the purpose of reason for the taxpayer's acquisition of the property and in disposing of it, the*287 continuity of sales or sales-related activity over a period of time, the number, frequency and substantiality of sales, and the extent to which the owner or his agents engage in sales activities by developing or improving the property, soliciting customers and advertising. The ultimate question is not the purpose for which the property was acquired but the purpose for which the property was held at the time of sale and no one of the above tests is determinative; the question must be resolved within a framework which includes all pertinent factors, with particular emphasis on the facts of the individual case. W. T. Thrift, Sr., 15 T.C. 366, 369 (1959); Estate of Peter Finder, 37 T.C. 411, 418 (1961). That all of the lots and tracts except the Tombion property were held primarily for sale to customers is, we think, evident from the facts. While petitioner Moss' original purpose for the acquisition of some of the land under discussion may have been for investment purposes, we are convinced that the sale of that land and the later acquisition and sale of various properties were sales primarily to customers in the ordinary course of his trade or business within*288 the meanining of the statute. Suffice it to say that the disposal of the properties under discussion must be viewed in the light of the purpose for which the property was held at the time of the sale and the record herein constitutes a history of increasing real estate activity such that petitioner Moss eventually became a large scale buyer and seller of tracts and lots of real estate. He conducted this business in conjunction with and in addition to, his law practice. His income from his real estate activities during the years in issue was far in excess of the amounts received from his law practice. Actually, his role as a buyer and seller of real estate constitutes a noticeable success story. The scope of Moss' real estate activities is factually divisible into two parts. During the period 1943 to 1954, Moss assembled the Wood Hill tract consisting of 214 acres of undeveloped land in a series of five separate straw transactions. Once assembled, ten lots were sold through Dasal Corporation17 to Kenny Builders, Inc., on October 25, 1954, with a purchase option for the remaining lots and tracts of land on a lot basis. This option to purchase was extended for five years from the*289 date of the original agreement on December 23, 1955. An examination of the original agreement and the extension of the option shows that Kenny Builders held an option which, if exercised, required it to buy at least 50 lots per year until October 25, 1959. In other words, Moss or his straws were obligated to sell at least 50 lots per year during all of the taxable years in question had Kenny Builders exercised its option in accordance with the agreement and extension thereto. The facts show, and we have found, that this agreement and extension were in effect for more than 2 1/2 years or until June 7, 1957, when Kenny Builders, Inc., signed a release of its option after buying only the original ten lots. 18*290 Following the failure of Kenny Builders, Inc., to exercise its option, the remaining 206 acres of the Wood Hill land was sold on November 15, 1958, pursuant to an agreement with Leeland Construction, Inc., with Taylor as straw. The mortgage taken by Taylor to secure the payment of $199,415 provided that the holder thereof would release any lot or lots from the mortgage upon payment of $450 per lot by the mortgagee or his assignees. The effect of this agreement was to allow for the release of the lots on a piecemeal basis upon the payment of the stated sum. Whatever may have been his original intent, the record shows that by late 1954, petitioner Moss was actively engaged in the buying and selling of real estate in the ordinary course of his business and had, on October 25, 1954, entered upon an agreement calling for the sale of various numbers of lots over a period of years. While the second agreement with Leeland Construction Co., Inc., did call for the sale of the remainder of the land on an acreage basis, the mortgage provided for piecemeal release of the lots. These transactions and petitioner's subsequent development of the Prouty Heights and Sherwood Forest lands convince*291 us that from this time forward, Moss' primary purpose, and the only discernible purpose of record, was the sale of various lots and tracts into which the various properties had been either divided or assembled, all at considerable profit to petitioner Moss and with the only exception being the Tombion property noted earlier. To recite in detail petitioner Moss' considerable activities in conjunction with the Prouty Heights and Wood Hill developments would only serve to burden this opinion. In each case the land was bought through straws and sold in accordance with an agreement and mortgage which provided for the sale of the land on a lot basis, or the sale of some lots with an option to buy others, and required the seller to prepare roads, install hot top, drainage, water mains and hydrants and do all those things pertaining to and in accordance with the development plan filed with the Burlington Planning Board. The only exception we have noted is the Tombion Property, which Moss acquired near the very beginning of his business of buying and selling lots and tracts of real estate. That property consisted of a small gas station which Moss acquired through a straw in 1954 and leased*292 to one Tombion in 1956 with an option to purchase. The parties have stipulated that it was operated as a going business and that it was sold to Tombion upon exercise of his option during the same year. We think that these facts and Moss' testimony of record are more consistent with an investment purpose both at the time of acquisition and sale and that the gain realized therefrom was long-term capital gain. We so hold. With regard to the issue of the mortgages taken back from the purchasers in partial payment of amounts due from the sale of real estate, it is Moss' position that mortgages taken back in conjunction with the sale of various lots and tracts of real estate during the years at issue were not income in the year of receipt but only in the years that actual payments on the mortgages are made. He regarded such payments as being incident to a deferred payment plan. It is his further position that he rightly ascribed to the worth of the mortgages received in part payment on the sale of the Prouty Heights and Sherwood Forest lands a zero valuation. Based on his alleged personal expertise on such matters and his sworn testimony thereto, Moss reasons that, since the mortgages*293 were in his opinion worthless, the property received has a zero valuation in the year of sale and the ultimate gain, if any, is simply deferred until the year of receipt. We think petitioner's admission that the value of a mortgage received upon a sale is considered as part of the selling price under the doctrine of Crane v. Commissioner, 331 U.S. 1 (1947), fairly takes care of this issue. Under that rule, mortgages taken back from the purchaser in part payment on the sale of real estate are part of the purchase price of the property and consequently are taxable in the year in which the sale occurred and the mortgage was given. The facts show that these mortgages were secured by the real estate and bear interest at rates stated in the documents. In each case, the land was sold to persons whose intent was to build and sell houses. In so far as appears, the buyer in each case took possession of the land shortly after the sale and became the beneficial owner, subject to those encumbrances with which the land was burdened. The contract fixed the purchase price and by its terms the buyer was under an unconditional obligation to pay that price. There is no evidence of record*294 to show that these mortgages were not freely negotiable. The only evidence as to their worthlessness is the opinion of petitioner. Nor is there any evidence of record showing losses from the mortgages during the years in issue. In fact, the parties agree that a seller's market existed during these years. The facts show a default on the part of one Ciardiello, but a second buyer was quickly found. Nor is there any evidence of record to support petitioner's theory of a deferred payment plan. We conclude that these mortgages were part of the purchase price at the time of the sale and that, to the extent they represent gain on the sale of the various lots and tracts, are taxable as income in the year of the sale. As stated before, the record as a whole shows that Moss' real estate transactions during these years were extremely successful from a financial point of view and for him to argue now that mortgages incident to these transactions were worthless during the year of sale is simply not supported by the facts. We hold for the respondent on this issue. Spruce Hill Realty Trust Spruce Hill Realty Trust was formed on April 9, 1959. Among other things, the declaration of trust makes*295 one Theodore L. Freeman of Winchester, Massachusetts, trustee to hold title to certain lands and to pay the net income from the transactions of the trust in equal shares to the following beneficiaries: Stephen B. Freeman of Winchester, Massachusetts, Ernest Jones of Burlington, Massachusetts, and Evelyn Jean Johnson of Stoneham, Massachusetts. Evelyn Jean Johnson, Moss' secretary, was named a beneficiary by him as a straw for his mother. Spruce Hill Realty Trust filed a U.S. Fiduciary Income Tax return for the taxable year 1959. Moss advanced the Spurce Hill Realty Trust $28,000 in 1959 to enable the trust to buy land on which to build houses, and the trust reduced the balance due to $3,000 the same year. On December 22, 1959, the trust issued a check for $2,000 payable to Moss. After the repayment of $2,000, the balance owing to him was $1,000. Payments of beneficiaries' shares of income made by Spruce Hill Realty Trust in 1959 were shown on the tax return as being made to the following persons in the following amounts: BeneficiaryAddressAmountErnest JonesLexington St.,Burlington, Mass.$7,479.95Stephen B. Freeman11 Lockland Rd.,Winchester, Mass.7,479.95Jack J. Mossc/o Jean Johnson62 Winn St., Bur-lington, Mass.7,479.95*296 Opinion It is petitioner Moss' position that the $2,000 received by him from Spruce Hill Realty Trust in 1959 represented the repayment in part of a loan which he advanced to the trust in order to finance its transactions. Respondent's position is that the $2,000 paid to Moss by the trust in 1959 is taxable to him as a dividend. Certain alleged irregularities with regard to the documentary evidence introduced by Moss are relied on by respondent to refute his claim. These purported irregularities relate to writings on the check stub supporting the $2,000 payment from the trust, which Moss presented before the Court and a purported alteration of the tax return of Spruce Hill Realty Trust. Respondent grounds his argument on the rule to the effect that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. See The Wichita Terminal Elevator Co., 6 T.C. 1158 (1946). The question with regard to this issue is purely one of fact and we think the evidence introduced by Moss, supported by his sworn testimony, is sufficient to overcome the presumption*297 of correctness which attaches to respondent's determination. While the record is not wholly clear as to all of the specific details of the transaction, the record shows, and we have so found, that Moss in fact made the loan in question and that the $2,000 in question represents repayment in part of that loan. Consequently, we hold for petitioner Moss on this issue. Decision will be entered under Rule 50. Footnotes1. Proceedings of the following petitioners are considered herewith: philip Taylor, Docket No. 3900-63; Jack J. Moss and Sarah Moss, Docket No. 3901-63; and Middlesex Industrial Park, Inc., Docket No. 3902-63.↩2. As stipulated by the parties.↩3. Moss took and held resignations from Taymor, Chadis and Peoli but apparently did not for some time submit them to Middlesex since the evidence shows that Chadis signed blank checks at the time of the opening of a checking account for Middlesex and later a note in the amount of $25,000 given by Middlesex was signed by Taymor and Chadis as president and treasurer, respectively. The record shows that by June 25, 1959, Taylor had become treasurer of Middlesex.↩4. It is Moss' testimony that he made the $10,000 down payment and personally endorsed the $40,000 promissory note. Moss testified that he had been town counsel for the town of Burlington and special counsel for the town of Bellerica for many years and, at the trial and since 1949, counsel for the Burlington Water District. He was also a member and chairman of the Burlington Planning Board and a delegate to the Massachusetts State Republican Convention at the time of trial. He stated that he took title to the Connor's Piggery land in the name of R. & T. Company and not his own "because of my political affiliations in the town and the politics that I had been engaged in." Little more, if anything else, is shown with regard to R. & T. Company except that Moss was its "clerk" and that title to the Connor's Piggery land was held in its name for something less than five months. (March 24 to August 5, 1953)↩5. Sarah Mogul was secretary to Harold A. Leventhal and held title for him. ↩6. It was specified that the sales price of $3,812 consisted of $3,333.33 for the land and $478.67 for earthern materials.↩7. The reproduction of this document, introduced in evidence as Exhibit 17-Q, is almost completely illegible.↩8. There is some confusion in the record as to the exact date on which the account was opened. The parties to this proceeding stipulated generally that it was opened in July of 1957. It was the testimony of Moss at the time of the trial, however, that the account was opened with $2,000 supplied by him and that it was thereafter on June 28, 1957, that Middlesex borrowed the $25,000 from the United States Trust Company.↩9. The deed shows that this land consisted of 10 parcels containing various numbers of lots and acres and, in so far as appears, the Murray Hills land was bought with the personal funds of Moss and Taylor. In evidence, at least, is a check from Moss to Murray Hills, Inc., for $3,000. The reason given by Moss for putting title to this land in the name of Middlesex was because the boundaries were very vague.↩10. The reproductions of the documents relating to this transaction are so illegible that little more can be determined than the fact that approximately 37.71 acres of land was sold by Middlesex to RCA subject to a mortgage.↩11. The evidence consists of 20 or more carbon copies of billing sheets and the figures as found are representative of the evidence as best showing the results of the sales as made. Approximations have been made in some instances where the sheets contain various pen and pencil notations. The evidence does not lend itself to findings with nicety.↩12. Wherever applicable, and unless otherwise noted, reference to these petitioners in an individual or collective capacity will be deemed to include reference to their wife or wives. The wives of these petitioners are involved primarily by virtue of the filing of joint returns. ↩13. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩14. § 301.7701-2 Associations, including organizations labeled "corporations." (a) Characteristics of corporations. (1) The term "association" refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. * * * An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust.↩*. Footnotes of the Court omitted.↩15. The evidence shows that the request to level the land was for the purpose of making the land suitable for farming but the parties stipulate that the purpose was for the sale of fill and gravel.↩16. The net loss of $83,393.13 is explained by deductions for interest on business indebtedness in the amounts of $58,994.43 and $40,753.84, respectively, for 1957 and 1958.↩17. We think that the facts are persuasive that petitioner Moss was the real party in interest to all the straw transactions involving the Wood Hill land and even if we concluded that Moss' wife Sarah was the real party, it would not affect our findings with regard to the disposition of the property. ↩18. It is significant of the good faith and intent of the parties to carry out this transaction that the agreement to extend the option signed on December 23, 1955, recites the fact that the parties agree that Kenny had commenced constructing the 10 houses and had bought 50 lots in 1954 and 1955 except certain lots to which Moss or his straw had not been able to deliver clear title. The record does not bear out the sales of lots in 1954 and 1955 but it leaves no doubt as to the position of Moss or his straws.↩