Jack J. and Sarah Moss v. Commissioner.
Moss v. Commissioner
Docket No. 3901-63.
United States Tax Court
T.C. Memo 1969-213; 1969 Tax Ct. Memo LEXIS 81; 28 T.C.M. (CCH) 1122; T.C.M. (RIA) 69213; October 14, 1969. Filed Norman E. Bayles, for the petitioner. Lawrence A. Wright, for the respondent. TURNER Supplemental Memorandum Findings of Fact and Opinion TURNER, Judge: At the initial trial herein this case was consolidated for the purpose of trial, the filing of briefs and the filing by the Court of its findings of fact and opinion, with Philip and Gladys Taylor, docket No. 3899-63; Philip Taylor, docket No. 3900-63; and Middlesex Industrial Park, Inc., docket No. 3902-63. The Court thereafter entered its findings of fact and opinion, T.C. Memo. 1966-29, in the consolidated cases. A motion was later filed in the consolidated cases for reconsideration, retrial or further trial on specified issues. After a hearing on the said motion, a further hearing was granted *82 herein, limited, however, to the question of the fair market value of specified notes and mortgages as of the respective dates they were received in payment for land sold in the taxable years 1956, 1957, and 1958. As to all other issues in this case and all issues in the three other cases, the motion was denied. The years before the Court are 1956 through 1959. The dates of the notes and mortgages, the makers of the notes, the mortgagors, and the face amounts of the said notes are as follows: Value Date (When
Markers and Mortgagors
Face Amount
Received by One of Petitioners
June 6, 1958
Leeland Construction Co.,
$ 199,415
December 17, 1956
Northern Building Corp.
48,925
November 2, 1956
Redmond Fahnley, Inc.
135,200
November 21, 1956
G. Ciardiello & Sons, Inc.
9,000
MAY 10, 1957
G. Ciardiello & Sons, Inc.
19,800 1123 Findings of Fact [1]
Some facts and some evidence have been stipulated by the parties *83 and the facts so stipulated are found as stipulated. Jack J. Moss and Sarah Moss are husband and wife, residing at 85 Clifton Street, Belmont, Massachusetts. They filed their Federal income tax returns for the taxable years 1956, 1957, 1958 and 1959 with the district director of internal revenue for the district of Massachusetts. Jack Moss, sometimes herein called Moss or petitioner, is an attorney with a business office at 4 Federal Street, Woburn, Massachusetts. Membership on the Burlington Planning Board is an elective office. Moss first became a member in 1943 and served on it "almost continuously for about 15 years." He was for many years town counsel for Burlington and special counsel for the Town of Billerica. He became counsel for the Burlington Water District in 1949 and was still serving in that capacity at the date of the original trial herein. [2] His service as a member of the Burlington Planning Board and as town counsel extended through most, if not all, of the taxable years herein. *84 Chapter 41, Section 81 U, of the Annotated Laws of Massachusetts, relating to planning boards and subdivision control, provides among other things that a planning board before approval of a plan may require provision for the construction of ways and the installation of municipal services in accordance with its rules and regulations and may require as a condition of approval of a plan that no lot be sold or building constructed until such ways are constructed and such services are provided. It is provided generally by the regulations of the Planning Board that no land may be subdivided into lots without prior approval of the board. During the taxable years herein, petitioner or petitioners sold all or parts of three tracts of land located in Burlington, known as Wood Hill, Prouty Heights, and Sherwood Forest. In the period 1955 through 1960 and up to the rehearing herein the burlington area was booming and this was particularly true of the construction and sale of family housing. Houses were being sold as fast as they were built and at times before they were completed. In many, if not most, instances the buyers moved in and began living in the houses immediately after they were *85 purchased. Wood Hill The area known as Wood Hill consisted of approximately 214 acres of undeveloped land in Burlington, Massachusetts, which was assembled by Moss by purchases through straw men over a period of years beginning December 20, 1943, and extending to April 5, 1954. Transfers of title to the several lots and parcels of land comprising the Wood Hill tract were made by the straw men to Dasal Corporation, a Massachusetts corporation, on various dates following Dasal's organization in 1947. Ninety-eight percent of the stock of Dasal was issued to Sarah Moss. [3]
Thereafter, on October 25, 1954, an agreement was executed between Dasal Corporation and Kenny Builders, Inc., sometimes referred to herein as Kenny, to sell 10 of the lots in the Wood Hill tract fronting on Wilmington Road to Kenny. As shown on Land Court Plan No. 12681G filed in the Massachusetts Land Court, the lots purchased by Kenny were lots 2, 3, 4, 5, 6, 39, 40, 41, 42 and 43. Kenny agreed *86 to start forthwith "construction of dwelling houses on the lots purchased, to complete said houses for sale to home-buyers expeditiously and to use the land for no other purpose." It was also provided that Kenny was to have an option to purchase the remaining lots and tracts of land, some 206 acres, specified in the agreement. The option was to continue for a period of five years from October 25, 1954, the date of the agreement, provided Kenny bought a total of 50 lots in the calendar years 1954-1955 and 50 lots in each succeeding calendar year and "substantially" commenced 1124 construction of 10 houses by January 1, 1955. Also, it was understood and agreed that the seller was under no obligation to complete installation of the roads and water service to the lots. When Kenny purchased the 10 lots on Wilmington Road, it redivided them into 10 house lots, renumbering them 1 through 10. On its redevelopment plan submitted to the Land Registration Office three entrances marked B,C and D, separated from each other by various of the 10 house lots, were shown. Each of the B,C and D areas was designated as "Public - 40.00 Wide," was 200 feet in depth, and ran from Wilmington Road *87 to connect with the remaining 206 acres of the Wood Hill tract on which Kenny had the option. In one or more plans later submitted to the Land Registration Office, whether by Kenny or others, B was shown as 1A,C as 4A, and D as 8A, one such plan being No. 26399A-2 recorded with the Land Registration Office May 29, 1956. In an agreement dated December 23, 1955, it was recited that Kenny "had substantially commenced said construction of ten (10) houses on said lots by January 1, 1955," and had bought a total of 50 lots in the calendar years 1954 and 1955, "EXCEPT for a certain few lots which he is unable to purchase within 1955 because the seller has been yet unable to deliver good title because the seller is still completing certain surveying work he is having done in preparation of registering title to said lots * * *." The option was to continue to run for the period of five years from the date of the October 25, 1954, agreement, "provided that the buyer buys a total of sixty (60) lots in a period of four months from the date the said title is registered, or in any event prior to January 1, 1957, and a total of fifty (50) lots in each succeeding yearly period then to follow." The *88 seller agreed "to start to register the title forthwith and complete the registration expeditiously in all good faith and at his expense." Land Court Registration Case No. 26399 was instituted on the petition of Dasal Corporation to clear title to the lots or parcels of the property comprising the Wood Hill tract. Some of the descriptions were vague or indefinite as to measurements and their relation to certain monuments. As to some lots or parcels, the records reflected fractional interests of heirs of which title had not been cleared. The land covered in Dasal's petition in Case No. 26399 was as "described on a plan dated January 16, 1956, surveyed by the Northeastern Engineering Associates, Douglas P. Forbes, C.E.," and excluded "ten (10) lots fronting on Wilmington Road, heretofore conveyed to Kenny Builders, Inc." By instrument of conveyance dated September 10, 1956, Dasal Corporation granted to Philip Taylor, brother of Sarah Moss, as a straw man, the variously described parcels of land comprising the Wood Hill tract, [4] * * * all as more fully shown on a Plan of Land on file in the Land Court with Petition of Dasal Corporation Registration Case No. 26399, * * * *89 Excluding from the granted premises Lots 1, 1A, 2, 3, 4, 4A, 5, 6, 7, 8, 8A, 9 and 10 as shown on a Subdivision Plan * * * recorded with the Land Registration Office at Boston on May 29, 1956 as Plan No. 26399A-2 * * * and heretofore conveyed by said Dasal Corporation to Kenny Builders, Inc. Hereby granting to said Philip Taylor a right of way over lots 1A, 4A, and 8A for all purposes for which public ways may be used, * * * said rights of way being shown on the aforementioned plan No. 26399A-2. On June 7, 1957, Kenny signed a release of its option to buy lots in the approximately 206 remaining acres of the Wood Hill tract. On February 15, 1958, Taylor, as straw man, entered into an agreement with Leeland Construction Co., sometimes hereafter referred to as Leeland, to sell to Leeland the land on Wilmington Road consisting of approximately 206 acres, described on the plan dated January 16, 1956, in Land Court registration Case No. 26399, Dasal Corporation petitioner, "excluding, however, ten (10) lots fronting on Wilmington Road, heretofore conveyed to Kenny Builders, Inc." It was recited that the said premises were also shown "as lots 11 to 387, both inclusive," on plan dated *90 August 12, 1957, 1125 which plan was attached to and made a part of the instant agreement. [5]
It was further recited that the said premises shown on the plan dated January 16, 1956, were "to be conveyed on or before April 15, 1958, by a good and sufficient quitclaim deed of the Seller, conveying a good, clear and marketable title of record to the same, free of all encumbrances." Said agreement provided further, in part, as follows: The Seller hereby agrees to proceed forthwith and complete the registration proceedings now pending in the Land Court (Case No. 26,399) for the registration of the land to be conveyed hereunder, and at the Seller's own expense. It is hereby agreed between the parties hereto, that this contract is upon the following conditions: 1. That the Town of Burlington, through its Planning Board, has legally approved the subdivision shown on the abovementioned "Woodhill Plan", and that the drainage lay-out referred to on said plan to be submitted by the buyer will be approved by the Town of Burlington. 2. That Town water will be available to *91 the Buyer on or before July 1, 1958. 3. That permits will be issued by the Town of Burlington upon application of the Buyer for the construction of single family dwelling houses on each of the lots shown on said plan excepting such lots shown on said plan as do not contain a minimum of twenty thousand (20,000) square feet of land. * * * It is further agreed that the aforesaid purchase money mortgage shall become immediately due and payable in the event that the Buyer shall sell in acreage, the whole or a substantial portion of the land to be conveyed hereunder, unless the Seller shall have assented in writing to said sale. * * * And for such deed and conveyance of the parcel hereinbefore described, the Buyer agrees to pay to the Seller the sum of one thousand dollars ($1,000) per acre, of which sum three thousand dollars ($3,000) have been paid this day, and the balance is to be paid by a note of the Buyer bearing interest at the rate of four (4) per centum per annum, said interest to be paid quarter-annually or sooner as hereinafter provided, and said note is to be secured by a power of sale mortgage in the usual form upon said premises. The principal of said note and mortgage *92 is to be payable as follows: Forty two thousand dollars ($42,000) on July 1, 1959, forty two thousand dollars ($42,000) on July 1, 1960, and the remaining balance on July 1, 1961. Said mortgage shall contaih a clause granting to the mortgagor the right to anticipate payment of the whole or any part of the principal sum of said mortgage at any time during the term thereof. Simultaneously with the delivery of the deed as hereinbefore provided, and the delivery of the note and mortgage representing the balance of the purchase money, the mortgagor agrees to pay to the mortgagee the sum of seventy seven thousand five hundred dollars ($77,500) in cash or certified check, and simultaneously therewith the said mortgagee agrees to deliver to the mortgagor a partial release from said mortgage of seventy (70) lots of land to be selected by the mortgagor, being seventy of the lots shown on the aforementioned subdivision plan of Woodhill dated August 12, 1957 or any reasonable modification of said plan made prior to the delivery of the said deed, and said sum of $77,500. so paid shall be credited by the mortgagee in reduction of the principal sum of said mortgage and note. It is understood *93 and agreed that said mortgage shall contain a provision requiring the mortgagee to release to the mortgagor such lot or lots shown on said Woodhill plan or any modification thereof made prior to the delivery of said deed, as said mortgagor shall request, provided however that the mortgagor shall pay to the mortgagee the sum of four hundred and fifty dollars ($450) for each lot so released, said sums so paid to be applied by the mortgagee to the unpaid principal of said mortgage, and in addition to the payment of each $450. the interest which shall have accrued on the unpaid principal balance of said mortgage as of the date when such release or releases are given, shall be paid by the mortgagor to the mortgagee up to the date when such release or releases are given. * * * If prior to April 15, 1958 an order for decree of registration shall have been entered by the Land Court on the presently pending petition for registration in case No. 26,399, the Buyer will be obliged to take title to the land to be conveyed hereunder, and a motion for Substitution of the buyer as petitioner shall be filed forthwith in the Land Court, and the 1126 Seller will proceed at his own expense to complete *94 the full registration, as hereinbefore provided, in the name of the Buyer. However, if an order for a decree of registration in said case No. 26,399 shall not have been made prior to April 15, 1958 by the Land Court, the Buyer shall be obliged to take title only to those lots to which the Seller can give a good, clear and marketable title, and the payment therefor shall be at the rate of one thousand dollars ($1000) per acre, to be paid by a purchase money mortgage from the Buyer to the Seller covering said lots, and the Buyer shall simultaneously pay over to the Seller the sum of seventy seven thousand five hundred dollars ($77,500) hereinbefore provided for the release of seventy lots from said mortgage, and this contract shall be extended for the conveyance by the buyer to the seller of the remaining land, until such time as an order for a decree in the Land Court has been entered theron. Thereupon a deed from the Seller to Buyer, and a purchase money mortgage shall be given by the Buyer to the Seller, so that the entire purchase price and mortgage and conditions thereof as aforesaid shall be consummated as though an order for a decree had been entered by the Land Court prior *95 to April 15, 1958. * * * If the Seller shall be unable to give title or to make conveyance as above stipulated, any payments made under this agreement shall be refunded, and all other obligations of either party hereunto shall cease, but the acceptance of a deed and possession by the Buyer shall be deemed to be a full performance and discharge hereof except as hereinbefore provided. Thereafter a plan was drawn by Northeastern Engineering Associates, Inc., dated March 1, 1958, showing boundaries of the Wood Hill tract, including the 10 house lots and areas B,C and D, into which the 10 lots purchased by Kenny in 1954 had been redivided. A copy of this plan drawn to a specified scale by C. M. Amerson, Engineer for Court, was shown as filed in the Land Registration Office on April 18, 1958, in Case No. 26399. The registration proceedings in Case No. 26399 were concluded by Land Court order on May 27, 1958, and on June 6, 1958, the tract comprising all of Wood Hill except the Kenny lots and areas B,C and D was conveyed to Leeland pursuant to the agreement of February 15, 1958, and Taylor as straw man received a note secured by a mortgage on the said tract in the amount of $199,415, *96 in payment of the balance of the "purchase money." The note and mortgage were payable "in or within" three years, of which, according to the February 15, 1958, sales agreement, $77,500 was payable simultaneously with the delivery of the note and mortgage, $42,000 on July 1, 1959, $42,000 on July 1, 1960, and the balance on July 1, 1961, with interest at 4 percent per annum payable semi-annually. The mortgage contained these further provisions: The mortgagee hereby agrees for himself and his assignees to release from the within mortgage such lot or lots as the mortgagor or his successors in title may request, upon payment to the holder hereof of the sum of four hundred and fifty dollars for each lot released together with such interest on this mortgage as shall have accrued to the date of such release. All of said boundaries are determined by the Court to be located as shown upon plan numbered 26399-A, which is filed with the original certificate of title No. 94871, the same being compiled from a plan drawn by Northeastern Engineering Associates, Inc., Douglas P. Forbes, Civil Engineer, dated March 1, 1958, and additional data on file in the Land Registration Office all as modified *97 and approved by the Court. There is excepted and excluded from the operation of this decree lots 1, B, 2, 3, 4, C, 5, 6, 7, 8, D, 9 and 10 on said plan, together with the fee in the soil of Wilmington Road to the middle line thereof adjacent to said lots. Upon conveyance of the land to Leeland and its execution and delivery of its note and mortgage for $199,415, the balance of the purchase price, Leeland made payment of $77,500 on its note and mortgage as required by the sales agreement of February 15 preceding. On some subsequent date not shown, Leeland, representing that it was the owner and holder of Certificate of Title No. 94967 describing Lot A and other land as shown on Plan 26399-A filed with Certificate No. 94871, whereon certain measurements were not entirely consistent with the monuments, and further representing that a portion of Lot A had been re-subdivided and shown as Lot 297 on a plan being numbered 26399-I on file at the Land Registration Office at Boston, whereon the monuments and measurements were correctly shown, filed a 1127 petition in the Land Court praying for approval of said plan. [6] After due proceedings the Court, in Case No. 26399-S and under *98 date of December 6, 1961, ORDERED that said plan 26399-I be approved and adopted for all purposes of the boundary and description, and it is further ORDERED that a copy of this order be received, registered and noted on Certificate No. 94967, and that reference thereto be made on plan 26399-A filed with Certificate No. 94871. After accepting conveyance of the approximately 206 acres of the Wood Hill land on June 6, 1958, Leeland immediately constructed public access roads through the so-called Kenny land at the three places designated as B,C and D on Kenny's development plan, also shown on the plan filed in the Land Registration Office, in case 26399, on April 18, 1958. Also, it proceeded to construct homes on the Wood Hill tract and sell them to the public. The Burlington area was booming at the time and Leeland had no difficulty in selling the new houses as they were constructed, and the buyers moved in and began living in the houses immediately after purchase. On their 1958 income *99 tax return petitioners, Jack and Sarah Moss, included $80,500 in computing the capital gains and losses reported by them for the said year, the said $80,500 being the $3,000, receipt of which was acknowledged in the February 15, 1958, sales agreement, and the initial payment of $77,500 on Leeland's note and mortgage. On their 1959 income tax return petitioners reported $42,000 as "Payment received on real estate mortgage." A payment in that amount on the Leeland note and mortgage was payable on July 1, 1959. The note in the face amount of $199,415 had a fair market value of $180,000 on June 6, 1958, when it was received. Prouty Heights On April 30, 1956, Moss purchased from Butterworth 15 acres of undeveloped land, generally referred to herein as Prouty Heights. The title was taken by Taylor as straw man. The tract was located on the west side of Wilmington Road directly across from the Wood Hill tract. Following its purchase Moss had the Prouty Heights land subdivided under Planning Board regulations and the subdivision approved by the Burlington Planning Board. A man by the name of Booker entered into an agreement to take all of the land but "backed out after taking three *100 lots." Under an agreement dated October 30, 1956, between Northern Building Corporation, sometimes hereafter called Northern, and Taylor as straw man, Northern agreed to buy 29 of the Prouty Heights lots and pay $52,925 therefor. [7] The lots were to be conveyed to Northern on or before November 30, 1956, "by a good and sufficient quitclaim deed of the party of the first part conveying a good and clear title to the same, free from all encumbrances." Payment of the $52,925 was to be made in cash and by the note of the buyer upon delivery of the said deed. The note was to be dated as of the date of the conveyance and payable in or within one year from date, at the election of the buyer, with interest at 4 percent per annum payable semi-annually. It was to be secured by a power of sale mortgage on the premises conveyed. The sales agreement contained agreements as follows: Seller agrees to *101 prepare the roads in accordance with the Burlington Planning Board Specifications and agrees to obtain a release from the Planning Board. Seller agrees to install the hot top on the roads adjacent to the particular lots designated by the Buyer within 60 days from the date of notice in writing received by him from the Buyer requesting the installation of the hot top and designating the lot numbers. As security for the performance of the obligation of the Seller to install said hot top, the Buyer may withhold the sum of $825.00 for each lot on which the hot top has not been installed on the road adjacent thereto, until said work is done. If from time to time as requested the Seller fails to install said hot top, then the Seller authorizes the Buyer to have hot top applied, and the Buyer shall be entitled to deduct from the $825.00 withheld the actual cost of having such hot top applied. 1128 Seller agrees to install drainage, water mains and hydrants for said lots in accordance with the plan filed with the Planning Board of the Town of Burlington, and in accordance with requirements of all public authority applicable thereto. Seller agrees that it is a condition precedent *102 to the obligation of the Buyer to take title hereunder, that building permits issue for the construction of houses upon each of said lots covered by this agreement, and that the drainage, water mains and hydrants be installed and that the sides of the road be cleaned up. * * * Seller agrees to give partial release for any particular lot herein upon the receipt of $1,000.00 together with any interest due and also upon the [8] * * *. * * * If the party of the first part shall be unable to give or to make conveyance as above stipulated, any payments made under this agreement shall be refunded, and all other obligations of either party hereunto shall cease, but the acceptance of a deed and possession by the party of the second part shall be deemed to be a full performance and discharge hereof. *103 By deed dated December 17, 1956, Philip Taylor conveyed the above 29 lots to Northern and on the same date Northern executed a mortgage in favor of Moss for $48,925 covering the 29 lots which had been conveyed to it pursuant to the agreement and to secure the payment of that amount in or within one year with 4 percent interest as provided in its note of even date. [9]
According to the mortgage, Moss as mortgagee was (a) to give a partial release on any particular lot upon receipt of $1,000 together with any accrued interest and a second mortgage and note in the amount of $825, the remaining balance on each lot, with interest at 5 percent per annum, (b) to *104 prepare roads in accordance with the Burlington Planning Board specifications and obtain a release from the Board, (c) to install hot top on roads adjacent to lots designated by the mortgagor within 60 days after a written request from the mortgagor. To secure this performance, the mortgagor could withhold the sum of $825 for each lot until the hot top was installed on the road adjacent thereto and in the event the mortgagee failed to install the hot top the mortgagor was entitled to install the hot top, deducting the cost thereof from the $825 withheld by it. Also, the mortgagee was to install drainage, water mains and hydrants for the lots in accordance with the plan filed with the Burlington Planning Board and in accordance with requirements of all public authority applicable thereto. These four requirements are the same in substance as those set forth in four of the above quoted paragraphs from the October 30, 1956, sales agreement. The mortgage contained no provision comparable to that quoted above from the sales agreement that "[Seller] agrees that it is a condition precedent to the obligation of the Buyer to take title hereunder, that building permits issue for the construction *105 of houses upon each of the said lots covered by this agreement, and that the drainage, water mains and hydrants be installed and that the sides of the road be cleaned up." Under date of December 27, 1956, Matthew Brown, presumably attorney for Northern, mailed the above mortgage to Moss at his office in Woburn, Massachusetts, [10] with the following covering letter: I return herewith the mortgage, to which I have affixed the corporate seal, and I enclose vote of authorization, as requested, for recording in the Registry of Deeds. Moss and his wife were in Florida at the time and Moss found the letter with enclosures upon his return to Woburn after the first of January 1957. On May 29, 1957, Moss as attorney for Nothern filed a petition in the Land Court to establish and clear title to the Prouty Heights tract. On some undisclosed date after conveyance of the 29 lots by Taylor to Northern a title search made in conjunction with the efforts by Northern to obtain 1129 construction money had raised the question as to whether the heirs of Alice M. Pushee, who had died June 4, 1883, had *106 a legal interest in the Prouty Heights property. In the petition filed it was alleged among other things that Northern and its predecessors in title had been in continuous adverse possession for more than 50 years. An out of court settlement was consummated whereunder the heirs of Alice Pushee, namely Howard S. and George H. Foster, on June 28, 1957, in consideration of $500 paid to them executed a deed in which they released to Northern any right, title and interest they might have to the land known as Prouty Heights. Following this release the Land Court on July 3, 1957, entered a final decree dismissing Northern's bill of complaint. Moss, at his own expense, constructed the roads in Prouty Heights pursuant to his agreements as shown in the mortgage. This work was completed before any houses were built on the lots. On his 1957 and 1958 Federal income tax returns (Form 1040) Moss reported the payments and profits on the sale of the Prouty Heights tract as follows: 1957
1958
Total
Selling Price
$37,571.24
$20,518.94
$58,090.1
Cost 34,662.92
47.50
34,710.42
Profit
$ 2,908.32
$20,471.44
$23,379.76
The note in the face amount of $48,925 *107 had a fair market value of $24,000 when received by Moss in payment of the balance of the purchase price of the Prouty Heights lots. Sherwood Forest The area known herein as Sherwood Forest was made up of two contiguous tracts of undeveloped land, one of approximately 40 acres and the other about 35 acres, acquired by Moss at a cost of $15,000 each. One tract of 40 acres was conveyed to Taylor as straw man by deed dated May 4, 1955, from Argyro J. Radiches, sometimes called Argyro J. Raditsis, who was formerly Argyro J. Avramides, [11] and sometimes referred to herein as Avramides. The other tract of about 35 acres was purchased by Taylor as straw man for Moss on September 19, 1955, from Ruth Nicholl, who was straw man for Kenneth MacIver. Aside from any other considerations Moss' interest in acquiring the MacIver land was sharpened by the fact that it fronted on a main road, whereas the only right of way to the Avramides land was involved in litigation. In the instrument of conveyance of the *108 40-acre tract by Avramides to Taylor, the description of the land was vague and indefinite in that it merely recited boundary lines with no measurements. The boundary lines were described or denoted by the naming of the properties adjoining it on each of its sides. In contrast, in the deed conveying the MacIver land to Taylor the metes and bounds were set forth in detail and were specific both as to monuments and measurements. The deed by which Ruth Nicholl conveyed the MacIver land to Taylor recited that it had been conveyed to her by deed of the Town of Burlington, dated March 26, 1946. Including the two tracts of land within one perimeter, Moss promptly initiated proceedings, Land Court Case No. 26214, for registration of the said land under the Massachusetts procedures for land registrations and to resolve any boundary or title problems. On some date not shown, but in any event prior to July 18, 1956, he had had the two tracts, as one whole, divided into 124 lots. [12]
*109 Also on some date not shown William H. Redmond, Jr. and Moss entered into discussions wherein Moss undertook to sell him "finished land" in accordance with the provisions of the Burlington Planning Board regulations, and Moss thereupon started to develop the land by putting in roads and water as required by the Planning Board. Redmond agreed to take lots in the Avramides portion of Sherwood Forest provided Moss sold him two front lots in the MacIver portion so that Redmond might have "a couple of model houses" on display. Under date of July 18, 1956, Taylor as straw man entered into an agreement with William H. Redmond, Jr. for the sale of lots 1 and 55 from the MacIver portion of the Sherwood Forest tract, with conveyance to be made on or before August 8, 1956, "by a good and sufficient quitclaim deed of the party of the first part, conveying a good 1130 and clear title to the same, free of all encumbrances." The price for the two lots was $3,600, $100 of which was shown as having been paid on the date of the agreement of sale with the remaining $3,500 [13] to be paid in cash upon delivery of the deed. *110 In addition, the agreement further granted to Redmond an option to purchase 21 additional lots, specified by numbers therein, on or before October 1, 1956, for $1,800 per lot, the buyer being free to purchase all or any number of the lots by paying $1,000 "upon the delivery of a good and sufficient quitclaim deed for each lot," and the balance of $800 by note of the buyer "secured by a power of sale mortgage in the usual form, * * * such note to be payable in or within sixty (60) days with interest at Five Percent (5%) per annum. The seller agreed "to complete the development of the roads for the lots, the hot top and the installation of water hydrants in accordance with the specifications of the Burlington Planning Board * * *." There was a final proviso that if the seller should "be unable to give or to make conveyance as above stipulated, any payments made" under the agreement should be refunded and all other obligations of either party cease "but the acceptance of a deed and possession by the party of the second part shall be deemed to be a full performance and discharge hereof." On November 2, 1956, Redmond Fahnley, Inc.[14] accepted conveyance from Taylor of 79 lots of *111 the Sherwood Forest tract including the 21 lots on which William H. Redmond, Jr. had the option under the agreement of July 18. In payment therefor, Redmond Fahnley, Inc., also on November 2, 1956, gave its note for $135,200 secured by a mortgage of the same date covering the 79 lots, the $135,200 being declared payable on or before December 31, 1957, with interest at 4 percent. By the terms of the mortgage the mortgagee agreed to grant a partial release for any or all of 63 of the 79 lots, as designated, upon receipt of $1,000 per lot, with the interest due as prorated among the several lots, and a second mortgage payable on or before December 31, 1957, for the $800 balance due on each lot, with interest at 4 percent. The mortgagee further agreed to discharge his first or second mortgage, as the case might be, for each lot that was fully paid for at the rate of $1,800 per lot with any accumulated interest due on that amount. *112 As to the other 16 lots, the mortgagee agreed to give a partial release for all or any of such lots upon request by the mortgagor and in return the mortgagor agreed to give the mortgagee a second mortgage on the said 16 lots in the amount of $21,800, being at a per lot rate of $1,362.50, payable on or before December 31, 1957, with interest at 4 percent payable at the end of the term, with the mortgagee further agreeing to give full release of any or all of the designated 16 lots upon payment by the mortgagor of 1/16th of $21,800, or $1,362.50, due under the second mortgage together with accumulated interest "for each particular lot desired to be released." The mortgagee also agreed to complete the roads and "water" in accordance with the requirements of the Burlington Planning Board and to install the hot top from "Cambridge Street along Nelson Road through Lot 10 and along Holly Street to Robinhood Lane." [15]
In the event the mortgagee did not complete the work on roads and water *113 within 60 days after demand by the mortgagor, the mortgagor might elect to do the work and deduct the expenses and costs thereof from any amounts due under "any of the aforementioned mortgages and this mortgage." The mortgagee further agreed that the mortgagor might apply any of the money that might be due mortgagee under the instant mortgage "to pay off and obtain partial releases from any or all of the lots under a mortgage duly recorded in said 1131 Deeds from Philip Taylor to Argyro J. Radiches * * *." [16]
Some of the lots sold to Redmond were at a lower level in the water shed than other ground nearby or adjacent which could result in an above average flow or accumulation of surface water for some lots. It was recited in the mortgage *114 that the land conveyed to Redmond was "[Subject] to easement for drainage and easement by Colonial Beacon Oil line, * * *." Redmond encountered a problem in providing proper drainage for some of the lots which had been acquired from Moss under the above arrangements and on which houses had been built. The basements of some (the number is not shown) of the houses built on the land would flood. It developed that some lots were so low that building permits could not be obtained, and under date of July 15, 1958, Redmond reconveyed 22 such lots to Taylor, which reconveyance was accepted by Taylor. With respect to some Sherwood Forest lots, the number and identity of which are not shown, financing difficulties were encountered because the land registration proceedings initiated by Moss had not been completed. To resolve this difficulty Moss gave Provident Institution of Savings his personal guarantee that the said proceedings would be completed and the financing difficulties were resolved. By agreement dated October 15, 1956, Taylor as straw man agreed to sell six designated lots of the Sherwood Forest tract to G. Ciardiello & Sons, Inc., sometimes referred to hereafter as Ciardiello. *115 It was provided in the agreement that Said premises are to be conveyed on or before November 15, 1956 by a good and sufficient quitclaim deed of the party of the first part, conveying a good and clear title of record to the same, free from all encumbrances and for such deed and conveyance the party of the second part is to pay the sum of TEN THOUSAND EIGHT HUNDRED ($10,800.00) DOLLARS of which No Dollars have been paid this day, ONE THOUSAND EIGHT HUNDRED ($1,800.00) DOLLARS are to be paid upon the delivery of said deed, and the remainder is to be paid by the note of the party of the second part, dated as of the date of conveyance bearing interest at five (5) per cent per annum, payable annually and secured by a power of sale mortgage, in the usual form, upon the said premises, such note to be payable in or within six (6) months from the date of conveyance and payable by way of SEVEN HUNDRED DOLLARS ($700.00) on a first mortgage and EIGHT HUNDRED DOLLARS ($800.00) on a second mortgage so as to permit Buyer to place construction mortgages on the lots. Seller agrees to comply with Planning Board requirements for the development of the lots and Buyer may withhold THREE HUNDRED DOLLARS *116 ($300.00) per lot until the hot top is installed. This agreement is conditional upon the Buyer obtaining bank financing and V.A. approval on any or all of the lots elected to be purchased. * * * If the party of the first part shall be unable to give title or to make conveyance as above stipulated, any payments made under this agreement shall be refunded, and all other obligations of either party hereunto shall cease, but the acceptance of a deed and possession by the party of the second part shall be deemed to be a full performance and discharge hereof. The agreement also gave Ciardiello an option to purchase all or any of the remainder of the lots on Davida Road, except Lots 73, 12A and 12B, and the lots on Ronald Road, except 107, 104 and 80, for $1,800 each. The terms of the option were further set forth as follows: * * * Said option shall continue April 1, 1957, and payment for the first ten (10) lots purchased on Davida Road under this option shall be made by the payment of $1,000.00 each at the time of the purchase and the balance of $800.00 on each lot shall be paid by way of a second mortgage in the sum of $800.00 with interest at 5% per annum, payable in or within *117 six (6) months from date of the mortgage. The remainder of the lots purchased under this option shall be paid for as follows: $300.00 at the time of passing papers and a mortgage of $1,500.00 with interest at 5% per annum for the balance due for each lot and Seller agrees to take a second mortgage in the amount of $800.00 on each of said lots payable as aforesaid when Buyer obtains his construction mortgages and pays $700.00 on each lot. 1132 Seller agrees to complete the installation of the water mains and hydrants and the hot top for the roads, as required by the Burlington Planning Board. Buyer may withhold the sum of THREE HUNDRED DOLLARS ($300.00) for each lot as security for the installation of the hot top. On April 4, 1957, the option was extended to May 1, 1957, and on May 6, 1957, extended to June 1, 1957. Taylor conveyed the six lots to Ciardiello and under date of November 21, 1956, Ciardiello gave its note for $9,000 secured by a mortgage of the same date covering the said six lots, the $9,000 being declared payable "in or within six months from date" with interest at 5 percent. By the terms of the mortgage the mortgagee agreed * * * to give partial releases *118 under this mortgage upon receipt of SEVEN HUNDRED DOLLARS ($700.00) together with accumulated interest for each lot and mortgagor agrees to give mortgagee a second mortgage for the balance of EIGHT HUNDRED DOLLARS ($800.00) that may be due together with accumulated interest on each of said lots so as to permit mortgagor to place construction mortgages on the lots. Mortgagor may withhold the sum of THREE HUNDRED DOLLARS ($300.00) on each lot until the hot top is installed on the roads in accordance with the requirements of the Burlington Planning Board. The six lots sold to Ciardiello pursuant to the agreement of October 15, 1956, and the lots on which an option to purchase was granted by the said agreement were in the MacIver portion of Sherwood Forest. On or prior to May 10, 1957, 11 additional Sherwood Forest lots, being lots on Davida Road and covered by the option granted by the sales agreement of October 1956, as later extended to June 1, 1957, were conveyed by Taylor to Ciardiello, for which Ciardiello also on May 10, 1957, gave its note for $19,800, secured by a mortgage of even date for the same amount covering the 11 lots, payable six months from date with interest at *119 5 percent. The mortgage recited that "[This] conveyance is subject to easement for drainage and easement of Colonial Beacon Oil Company * * *." There was the further provision that "[This] mortgage is subject to a prior first mortgages to Chelsea Savings Bank by mortgagor herein [17] * * *." As shown by the mortgage the terms whereby the 11 lots were purchased did not follow those specified in the option to purchase which was contained in the October 15, 1956, sales agreement covering the six lots above. Further there was no recital in the instant mortgage of any requirement on the mortgagee to complete the installation of any water mains and hydrants or hot top for roads and the like. Under date of October 10, 1958, Moss caused a writ to be issued to attach $2,000 on deposit with the Depositors Trust Company, alleged to belong to G. Ciardiello. According to the writ, it was issued by Moss "in an action of contract *120 (money due on written agreement)" against Ciardiello. The period from 1953 through 1960 and up to the date of the further hearing herein, which included 1955, when the two tracts comprising Sherwood Forest were purchased by Taylor for Moss; 1956, when the 79 lots were conveyed to Redmond and for which he gave a note and mortgage in the face amount of $135,200 and the six lots were conveyed to Ciardiello for which Moss received $1,800 in cash and a note and mortgage for $9,000; and 1957, when an additional 11 lots were conveyed to Ciardiello for which he executed his note and mortgage in favor of Moss for $19,800, was a booming period for the construction of new houses in the Burlington area, houses in the Sherwood Forest development were bought and people moved in as fast as the houses were built and in some cases houses were purchased prior to completion. The sales of lots in Sherwood Forest in 1956 were two lots to Redmond conveyed on or about August 8, 1956, the 79 lots conveyed to Redmond on November 2,1956, and the six lots to Ciardiello conveyed on November 21, 1956. In 1956 the purchasers made payment to Moss on such sales amounting in the aggregate to $15,370.48. The *121 fair market value of the Redmond note for $135,200 given on November 2, 1956, in payment for the 79 lots in Sherwood Forest was $45,000 when received by Moss. 1133 The fair market value of the Ciardiello note for $9,000 given on November 21, 1956, in payment for six lots in Sherwood Forest was $4,500 when received by Moss. The fair market value of the Ciardiello note for $19,800 given on May 10, 1957, in payment for the 11 lots in Sherwood Forest was $9,500 when received by Moss. Opinion Under section 1001(b) of the Internal Revenue Code of 1954, "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." The fair market value of a note and mortgage at a particular time is a question of fact to be determined by all circumstances connected with the underlying mortgage, but "only in rare and extraordinary cases will property be considered to have no fair market value." Section 1.1001-1, Income Tax Regulations.[18]
*122 In various of the taxable years the petitioner sold the remainder, approximately 206 acres, of the Wood Hill tract, the remaining 29 lots in Prouty Heights, and in three separate sales 98 of the 124 lots in Sherwood Forest, receiving notes secured by mortgages on the property sold in payment of the purchase prices or the balances thereof. In the Wood Hill, Prouty Heights, and the first of the two sales to Ciardiello, relatively small amounts of the selling prices were payable prior to or on the dates of conveyance. As for the 79 lots in Sherwood Forest conveyed to Redmond on November 2, 1956, Redmond did have an option to purchase 21 of the 79 lots, but if there was a prior agreement covering the other 58 lots, it was not placed in evidence and we are advised only that upon conveyance of the 79 lots petitioner received in payment a note for $135,200 payable on or before December 31, 1957, secured by a mortgage of the same date on the lots conveyed. The second sale to Ciardiello covered 11 lots for which petitioner received at the time of conveyance a note for $19,800 secured by a mortgage on the lots sold. The $19,800, the face amount of the note, averaged $1,800 per lot and *123 inasmuch as that seemed to be the rate at which most of the Sherwood Forest lots were sold we assume there was no initial cash payment. It is the contention of the petitioners that each and all of these notes were worthless when received and no amount representing the fair market value thereof is to be taken into account in reporting income on the transactions for the respective taxable years. As sustaining this position, the petitioners rely strongly, if not conclusively, on the testimony of two witnesses called as experts to give opinion testimony as to the fair market value of the notes on the respective dates they were received. One such witness, sometimes referred to hereafter as petitioner's first expert witness, gave opinion testimony with respect to all five of the notes and mortgages. The second such witness did not testify with respect to Wood Hill. In arriving at their opinions that the notes were worthless, the witnesses stressed the various obligations of the seller, chiefly with respect to title, the completion of the streets, and the assurance of the necessary connections for supplying water. With respect to title the contracts of sale uniformly provided that if *124 the buyer should be unable to give title or to make conveyance as stipulated therein any payments previously made under the agreement should be refunded and all other obligations of the parties should cease, but that the acceptance of a deed and possession by the buyer should be deemed to be a full performance and discharge thereof. It is the contention of the respondent that on the facts of record the notes did have fair market value when received, and that the said values were in the amounts testified to by his witness, called as expert to give opinion testimony as to value, rather than face value as originally claimed. We have carefully examined and considered the evidence of record. We heard and observed the witnesses called by petitioner as experts, as well as Moss himself, and have reviewed their testimony in relation to all other evidence, and we are of the 1134 opinion that the facts shown adequately and convincingly refute the conclusion that the notes in question herein were worthless and of no fair market value when received in payment for land the makers had purchased. Similarly, we are equally convinced that the fair market value of the note in each instance was *125 not as great as that testified to by the respondent's witness. See and compare Joseph Marcello, Jr., 43 T.C. 168, where the issue was quite similar to the issue here and as in this case there were two expert witnesses for the petitioner and one for the respondent. It appears to be generally agreed that during the years herein business in the Burlington area was booming and that this was particularly true of the construction and sale of family housing. Houses were sold as fast as they were built, and in instances before they were completed. Also purchasers moved in and began living in the houses as soon as they were purchased. Petitioner's first expert witness so testified and the testimony of Moss was in accord. Wood Hill As the basis for his opinion that the note and mortgage received by petitioner in payment of the balance of the sales price of the Wood Hill property to Leeland were not marketable but worthless when received, petitioner's first expert witness placed special emphasis on two points: First, that the seller could not deliver good title to the buyer, and second, that the entire tract was landlocked and the buyer had no right of access to the property. *126 It was also his view that the existence of either situation would have rendered the note and mortgage worthless and of no fair market value when received. It is true that on February 15, 1958, when the sales agreement was entered into, the registration proceeding initiated by Dasal in 1956 to clear and settle title had not been concluded. The fact is, however, that the note and mortgage were not executed and delivered on February 15, 1958, the date of the sales agreement, but on June 6, 1958, after conveyance by Taylor of the property to Leeland and its acceptance thereof. At that time, according to the order of the Land Court, the registration proceedings stood completed. In disposing of the case the Court declared that all of the boundaries were determined to be located as shown upon Plan No. 26399-A which was filed with the original certificate of title 94871 compiled from a plan drawn by Northeastern Engineering Associates dated March 1, 1958, and additional data on file in the Land Registration Office, all as modified and approved by the Court. Such was the situation when the conveyance of the land was made and Leeland executed and delivered its note and mortgage for $199,415 *127 in payment therefor. The witness indicated that he was familiar with the above order which, "according to the instruments" he held while testifying, was dated May 27, 1958. His further testimony was, however, that the May 27 order "was found to be in error and was later corrected, * * * on December 6, 1961" and it was his opinion that as shown by the said December 6, 1961, order the seller could not theretofore deliver good title to the Wood Hill land and the note and mortgage were accordingly worthless and of no fair market value when received. It does appear that Leeland, on some date not shown, following the conveyance of the Wood Hill tract to it and the making and delivering of its note and mortgage, as petitioner or substituted petitioner did file a petition in the Land Court as owner and holder of Certificate of Title 94967 "describing lot A and other land as shown on Plan 26399-A filed with Certificate No. 94871 whereon certain measurements are not entirely consistent with the monuments," and further representing that a portion of the said lot A had been resubdivided and shown as lot 297 on a new plan numbered 26399-I on file at the registration office, whereon the monuments *128 and measurements were correctly shown, prayed for approval of the new plan. The Land Court by order dated December 6, 1961, approved and adopted Leeland's proposed Plan 26399-I for all purposes of the boundary and description and further ordered that a copy thereof be registered and noted on Certificate No. 94967 and that reference thereto be made on Plan No. 26399-A filed with Certificate of Title No. 98471. Although the only parcel of property specifically singled out in the proceeding which resulted in the December 1961 order was lot A, both the expert witness and moss, testifying in broad and general terms, voiced opinions that the defect in title cleared by the said December 1961 Land Court order affected the Wood Hill lots generally or throughout the tract. 1135 In that connection it is to be noted from the December 23, 1955, agreement with Kenny, even before the registration proceedings based on the plan dated January 16, 1956, were instituted by Dasal, it was only "EXCEPT for a certain few lots" that petitioner was unable to deliver good title. Furthermore, the events occurring from and after delivery by Leeland of its note and mortgage not only fail to corroborate *129 the conclusion that by reason of a defect in title the note and mortgage had no fair market value when received but in our opinion refute it. After accepting conveyance of the property on June 6, 1958, Leeland delivered its note and mortgage for $199,415 and also made a $77,500 payment on the note. It immediately constructed access roads through areas B,C and D, extending from Wilmington Road to the Wood Hill tract it had purchased, the said B,C and D areas being located at intervals between various of the 10 Kenny house lots as shown on the redevelopment plan submitted by Kenny to the Land Registration Office. It proceeded with its program of building houses which required sizable loans. The houses so built were sold and the buyers moved in and lived in them. We find no evidence that any problems were encountered or experienced with respect to any of the houses constructed and sold because of a title defect. The overall record, including the testimony of petitioner's expert witness and that of Moss himself, rather forcefully indicates that Leeland's program continued steadily and that such was the case regardless of the title defect resolved by the Land Court order of December 1961. *130 In addition to the $77,500 initial payment on the note, in 1959, some two years prior to the December 1961 Land Court order, Leeland also paid the first of the $42,000 payments required under the sales agreement of February 15, 1958. In the face of such facts we can only conclude that the defect in title settled by the December 1961 order actually had to do with and affected only an extremely small segment of the Wood Hill tract and the conclusion that by reason of a defect in title the note and mortgage of June 6, 1958, were worthless was not sound or well taken. We reach the same conclusion with respect to the opinion of the witness that Leeland had no legal right of access to the Wood Hill property when purchased and its note in payment of the purchase price and the mortgage given as security therefor were accordingly worthless when made and delivered. We have no reason to question the accuracy of the testimony of Moss that up to the time of the further hearing herein no formal order had been entered by the Land Court declaring areas or lots B,C and D, shown on the Kenny redevelopment plan submitted to the Land Registration Office as "Public - 40.00 Wide," to be public ways. *131 We do not question the accuracy of his testimony that after the conveyance of the Wood Hill land to Leeland he tried without success to obtain a formal grant of right of way from Kenny for Leeland over the said lots B,C and D, and in such effort prepared an easement of right of way which Kenny and his attorney refused to sign. In so far as we have been able to learn, no request was ever made of the Land Court for such formal order unless it was in the petition of Kenny when submitting its redevelopment plan above mentioned. We have never seen the Kenny petition nor the Land Court order disposing of it, if such an order was issued. It is true that the 10 Kenny house lots and B,C and D were shown on the plan dated March 1, 1958, filed in the Land Court and numbered 26399-A, but it also appears that the petition in that case excluded the 10 Kenny lots and B,C and D from the subject matter of the petition which was to clear title and dettle the boundaries of the approximately 206 acres later sold to Leeland, and such specific exclusion may well have been the occasion for the Court's failure to cover areas B,C and D as public ways in its May 27, 1958, order. The record does show *132 that in the instrument of conveyance of the Wood Hill tract by Dasal to Taylor on September 10, 1956, Dasal purported to grant to Taylor a right of way over lots 1A, 4A and 8A, shown herein to be the same as B,C and D, and declared that the grant was "for all purposes for which public ways may be used." It is thus apparent we think that the parties in interest, Kenny when he filed his house lot plan in the Land Court and Dasal and Taylor in the September 10, 1956, conveyance by Dasal to Taylor, did indicate a purpose to treat B,C and D as "public" ways, and that, even though Kenny did not exercise his option to buy the remainder of the Wood Hill tract and he and his lawyer after the sale to Leeland did refuse the request of Moss to sign a formal grant of easement of right of way to Leeland which Moss had prepared. 1136 That such was the case is corroborated we think by the fact that upon accepting conveyance of the Wood Hill property Leeland immediately proceeded with the construction of streets through the three areas mentioned, that thereafter the streets so constructed were used not only by Leeland and the purchasers of houses from Leeland but were available to the public *133 for ingress and egress to the Wood Hill property generally, and there is no indication or claim that Kenny or anyone else ever undertook to prevent such construction of streets or their continued use as such at any time thereafter. Such being the case, we think that areas B,C and D, or 1A, 4A and 8A, however denominated, were commonly regarded and accepted as ways of ingress and egress to the Leeland property at the time of or even before, and most certainly after, delivery by Leeland of its note in payment for the property and the lack of formal grant did not, in our opinion, render the note and mortgage unmarketable and thereby worthless when received as petitioner's expert witness testified they were. The petitioner's witness also took the position that the three specified conditions in the sales contract of February 15, 1958, were weighty factors in rendering the note and mortgage unmarketable and thereby worthless when received, the three conditions being (1) that the Town of Burlington approve the subdivision and the drainage lay-out both as shown on the plan, (2) that Town water be available to the property on or before July 1, 1958, and (3) that permits for the construction *134 of single family dwelling houses on each lot be issued upon application of the buyer. The approval by the Town of Burlington of the subdivision and the drainage lay-out as shown on the plan, the availability of Town water on or before July 1, 1958, and the requirement that construction permits for houses would be issued by the Town of Burlington on application of the buyer were all conditions as set forth in the sales agreement of February 15, 1958, available to Leeland for refusing to accept conveyance which was prerequisite to his obligation to execute and deliver its note and mortgage. The acceptance of conveyance of the property by Leeland and its execution and delivery of its note and mortgage did not take place until June 6, 1958, nearly four months later, and in accepting conveyance on June 6 there is no claim that Leeland raised any question that either of the requirements had not already been satisfied or would not in normal course be met or performed as needed. Under the contract it was not essential that Town water be available until July 1 but there is no suggestion or contention that it was not in fact available by the required date or even as early as the date of the *135 note and mortgage. Also it is to be noted that unlike some of the other mortgages herein the mortgage in this instance contained no provisions making its payment and satisfaction subject to the conditions referred to above, from the February 15 sales agreement. As bearing upon the issuance of building permits petitioner's witness in the course of his testimony referred to a requirement of the Town of Burlington for a percolation test on each lot to determine whether the soil was suitable for an individual sewerage disposal system, stating that if the test showed that the soil was found not to be suitable no building permit would be issued. When asked whether on the basis of personal knowledge of the land it had happened that in some instances building permits were not obtained because of unsatisfactory percolation tests, his answer was that he had been directly connected with that land and "I know the type of that land and that is why I refused to allow Mr. Kenny to go ahead and purchase." He did not amplify his response to indicate the extent to which building permits, if any, were denied for Wood Hill lots because of adverse results of percolation tests, whether in Kenny's experience *136 or that of Leeland. That the impact of the percolation tests requirement was a serious reduction factor in the value of the note and mortgage herein when received is in our opinion refuted rather than corroborated by the testimony of the witness himself and by that of Moss in describing the rate and extent of the construction and sale of houses in Wood Hill following its acquisition by Leeland, particularly when coupled with the absence of any contention that in procuring building permits Leeland did actually encounter difficulties by reason of adverse percolation tests. A matter of further concern to us with respect to the testimony of the witness and his opinion that the Wood Hill note and mortgage were worthless and of no value when received is that at times he appeared to confuse the sales agreement and its date 1137 of execution with the note and mortgage executed and delivered in payment for the Wood Hill land some four months later. When asked on cross-examination if he was aware of the fact that $77,500 of the $199,415 face amount of the note and mortgage was to be paid immediately and if it was his opinion that the note was "not worth even the $77,500 that was paid immediately, *137 " his response was, "It was not paid. * * * Not at the time this agreement was drawn." After agreeing that the $77,500 was to be paid "at the closing," the question was "So, in your opinion, even though $77,500 is going to be paid right off * * * you won't even value it [the note] at that?" The answer was, "No. As a matter of fact it had not been paid. This is to be paid providing certain conditions are met." In contrast, not only does petitioner Moss not dispute the payment of the $77,500 on the note "at the closing" but his testimony was that it was so paid. On cross-examination the witness did agree that as Leeland's development of Wood Hill progressed the note and mortgage did have value but this apparently he regarded as not foreseeable at the date the note and mortgage were executed and delivered to Moss but as "after the fact" in that the "sale of the houses came after the houses were built and the houses were built after the financing was provided and the financing was provided after Mr. Moss gave a personal guarantee to the lending institutions that these conditions would be corrected." The evidence does show as set out in our findings of fact that with respect to some *138 Sherwood Forest lots, the number and identity not being shown, financing difficulties were encountered because the land registration proceedings had not been completed and that Moss did give his personal guarantee to Provident Institution of Savings to complete the land registration proceedings. But as to Wood Hill we have not been able to find any evidence that Moss gave any such guarantee to any lending institutions. Moss did not so testify. He did in the sales agreement of February 15, 1958, contract with Leeland "to proceed forthwith and complete registration proceedings" then pending in the Land Court "for the registration of the land to be conveyed" thereunder. Further we find no evidence indicating any instances where Leeland had difficulty in obtaining financing or had any assistance from Moss with respect thereto. It is the contention of the respondent that the fair market value of the Leeland note and mortgage when received by him was $192,875 as testified by his expert witness. In arriving at that value the witness noted that the interest provided was at 4 percent which he did not feel would be acceptable to a purchaser of the note and mortgage. He did regard a yield of *139 7 percent as adequate and discounting the note so as to provide such a yield to a purchaser he arrived at $192,875 as its fair market value when received. He was vigorously cross-examined as to the effect, among others, of access or lack of access to the Wood Hill land, the effect of a Land Court proceedings for registration of the land so as to clear title defects as testified to by Moss and others of his witnesses and the effect of the obligations of the seller, as specified in the three numbered paragraphs of the February 15, 1958, sales agreement, to assure Leeland that the Planning Board had approved the "Woodhill" subdivision and that the drainage layout on the plan to be submitted to the Planning Board would be approved; that Town water would be available to the buyer on or before July 1, 1958; and that permits would be issued upon application of the buyer for the construction of single family dwellings on each of the lots except such lots as did not contain a specified minimum of square feet. The witness indicated that he was aware of and had noted the matters on which he was so examined but expressed as his opinion that they were not of such substance or effect to require *140 a further discount in order to make the note and mortgage acceptable to a willing purchaser. He did not for instance regard a registration proceeding "per se as a defect in the mortgage" nor the assumption that there was no access to the land as being factually correct. We have examined and carefully considered all of the evidence of record and the facts derived therefrom, and in the light of the evidence and facts have also considered the testimony of the two expert witnesses, the one for petitioner and the one for the respondent. In doing so we have weighed their opinions and noted the differences between them as to their force and effect. After so doing, it is our opinion and conclusion that the note of Leeland in the face amount of $199,415 made and delivered to 1138 Moss on June 6, 1958, secured by the mortgage of even date had a fair market value of $180,000 when received by Moss and in our findings of fact have so found. Prouty Heights With respect to Prouty Heights and to Sherwood Forest, covered hereafter, the conditions of sale and terms of the mortgages vary in certain respects from those in Wood Hill above. Also there are differences as to the terms of payment *141 of the notes and in satisfaction of the mortgages. As to each of the sales herein, in respect of which a sales agreement is of record, the agreement recited various conditions and requirements, some to be satisfied by the seller and some by the buyer. Among others, the sales agreements uniformly contained a provision to the effect that if "the party of the first part shall be unable to give or to make conveyance as above stipulated, any payments under this agreement shall be refunded, and all other obligations of either party hereunto shall cease, but the acceptance of a deed and possession by the party of the second part shall be deemed to be a full performance and discharge hereof." Particularly with respect to the 29 Prouty Heights lots sold to Northern, 21 of the 79 Sherwood Forest lots sold to Redmond and the first six Sherwood lots sold to Ciardiello, the mortgages clearly show that as of the dates of conveyance of the lots to the buyer and of the execution and delivery of the notes and mortgages to the seller, the seller had not fully satisfied all of his obligations under the prior sales agreements as to the Prouty Heights lots and the six Sherwood Forest lots sold to Ciardiello *142 and as shown in the option agreement with respect to the said 21 of the 79 lots sold to Redmond. In each such instance at least some of the obligation provisions from the sales and option agreements were repeated, in substance if not literally, in the mortgages executed as security for the notes delivered in payment for the lots purchased. In such circumstances it is not unreasonable, we think, to conclude that by reason of the above quoted provision, that the acceptance of a deed and possession by the buyer is to be deemed to be a full performance and discharge of the obligations of the seller as set forth in the sales and option agreements, the said provisions were carried into the mortgage to assure the buyer that to the extent the previously imposed obligations of the seller had not been satisfied, they were still subsisting at the time of conveyance and would not be obviated by acceptance of the deed of conveyance. In the case of Wood Hill the only such provision carried into and recited in the mortgage was to the effect that "the mortgagee hereby agrees * * * to release from the within mortgage such lot or lots as mortgagor * * * may request, upon the payment to the holder *143 hereof of the sum of four hundred and fifty dollars for each lot released together with such interest on the mortgage as shall have accrued to the date of such release." In the case of Prouty Heights, the sales price was $52,925 which, according to the sales agreement, was to be paid in cash and by note of the buyer upon delivery of the deed. The note was for $48,925, indicating that $4,000 was the amount payable in cash. The record is not clear as to the time of actual payment of that amount. In so far as appears, the note was delivered by Northern to Moss on December 17, 1956, the date of its execution. The mortgage apparently was returned by Moss for the affixing of the corporate seal and was mailed back to Moss by Northern's attorney on December 27, 1956. The note was payable in or within one year from date at the election of the buyer with interest at 4 percent per annum. No interim payments were required of Northern but it was specified that Moss, as mortgagee, agreed to give a partial release for any particular lot upon receipt of $1,000 plus any interest due and the further receipt of a second mortgage and note for $825, the balance remaining due on each such lot, with *144 interest at 5 percent per annum. In short, under the terms of the mortgage Northern, for the partial release of the 29 lots or any of them from the mortgage on or before the payment date of the note, was required to pay over $1,000 per lot, or $29,000 for all 29 lots. Having received payment of $1,000 per lot on any or all of the 29 lots the mortgagee was obligated to accept, in lieu of the $825 per lot still owing under the instant mortgage, a second mortgage or mortgages of $825 per lot, which for all 29 lots would be $23,925. Neither the sales agreement of October 30, 1956, nor the mortgage of December 17, 1956, contained any provision with respect to the date or dates of payment for the $825 second mortgages. 1139 Under the further terms of the mortgage the mortgagee agreed to prepare the roads in accordance with the Burlington Board's specifications and to install hot top on roads adjacent to lots designated by the mortgagor within 60 days after request therefor in writing. To secure this performance the mortgagor could withhold payment of $825 for each lot until the hot top was installed, and, in the event the mortgagee failed to install the hot top the mortgagor was authorized *145 to have the hot top applied and deduct the actual cost therefor from the $825 per lot withheld. The mortgagee also agreed to install drainage, water mains and hydrants in accordance with the plan filed with the planning board of the Town of Burlington. It thus appears that by its terms the mortgage, the security for the payment of the note, was burdened by the obligation of Moss as mortgagee to complete and surface the roads at his own expense and the similar obligation to install drainage, water mains and hydrants for the lots. As a defect in title the petitioners stress the latent or possible claim by the heirs of Alice M. Pushee that they had a legal interest in the Prouty Heights land. With respect to the requirements of the Planning Board for the installment of improvements in a subdivision it was the testimony of Moss that the developer either did the work first or posted a bond that he would do the work. Moss did not post a bond but did the work himself, completing the installation before any houses went up. At the time of giving his testimony he purported to have memoranda showing a breakdown of the complete cost to him of the Prouty Heights project, excluding any charge *146 for his own activity in supervising the work. He was asked to state the complete cost for just the road work. After mentioning expenditures of $7,326.13 and $1,700, the purposes of which were not identified, it was his testimony that "deduct the cost of the land, around $35,000" would be a rough estimate just for the road work, "no engineering, no land costs, no title clearance, no fill." He gave no testimony as to the actual cost to him for installing drainage, water mains and hydrants for the lots. The petitioner called as an expert witness a former junior civil engineer in the Division of Highways in the Department of Public Works, Commonwealth of Massachusetts, and currently an employee of a concern doing heavy construction in highway work to give retrospectively an opinion as to the cost of developing the Prouty Heights and Sherwood Forest tracts "as required by the mortgages." He gave an estimate of $35,079.50 as his opinion of the total cost for the development of the Prouty Heights tract "as required by the Burlington Planning Board regulations." He gave no breakdown of costs as between the building and completing of the roads and the installing of drains, water mains and *147 hydrants. It was the testimony of Moss that the bank would not accept construction mortgages from Northern because it appeared in the title search "that there were defects in the title" and he "had to bring a petition to establish title" before the bank would accept such mortgages. The question was whether the heirs of Alice M. Pushee who died on June 4, 1883, might have some legal interest in the Prouty Heights property. The date of the title search is not shown but on May 29, 1957, Moss as attorney for Northern filed a petition in the Land Court to clear title, alleging among other things continuous adverse possession for more than 50 years. An out of court settlement for $500 was consummated on June 28, 1957, some thirty days later, with Howard S. and George H. Foster, the heirs of Alice M. Pushee, whereunder they executed a deed to Northern releasing any right, title or interest they might have in the land and the court thereupon dismissed Northern's bill of complaint. As establishing their claim that the note and mortgage received from Northern in payment for the Prouty Heights lots had no fair market value when received, the petitioners rely on the testimony of their *148 two expert witnesses, the first such witness being the same witness who also testified with respect to the Wood Hill note and mortgage. The second witness testified only with respect to the Prouty Heights note and mortgage and the three notes and mortgages received in payment for the sale of lots in Sherwood Forest. It is the contention of the respondent that on the evidence the note and mortgage had a substantial fair market value when received and that the value as of the date received was $30,225 as testified by his expert witness. Assuming a defect in title it was the opinion of both of petitioner's expert witnesses that a title defect would alone render 1140 the note and mortgage of no fair market value. As another factor having a burdening effect on the value of the note and mortgage it was the opinion of both witnesses that the mortgage should be regarded as a second mortgage. The conclusion that it should be so regarded is not exactly clear. The second expert witness based his conclusion to that effect on the proposition that the instant mortgage "has a subordination." Presumably he had reference to the provision which permitted the mortgagor upon payment of $1,000 *149 per lot on any or all the lots, to substitute a second mortgage as security for the payment of the remaining $825 per lot. And, if we followed the first expert witness aright his conclusion that the mortgage herein was a second mortgage was based on similar grounds. Just what consideration, if any, was given by either witness to the fact that prior payment or payments at the rate of $1,000 per lot, or $29,000 on all lots, was a prerequisite to the privilege of giving in payment of the $825 balance per lot a second mortgage in that amount per lot instead of making the payment in cash, does not appear. One matter of concern with the testimony of the second expert witness is that his opinion that the note was worthless when received was very strongly oriented to the proposition that his employer, a commercial banking institution, would not pay anything for a second mortgage note. It was later revealed on cross-examination that as a matter of policy, regardless of value, his employer-bank did not in any case buy such notes and mortgages. In that connection it is noted that the first witness, on cross-examination, previously agreed that "normal barks and lending institutions" do not "become *150 involved in second mortgages on development projects." That is not to say, however, that there is no market for second mortgages and because a mortgage is a second mortgage it has no fair market value. It was the testimony of Moss that his receipts on the sale of land which would include the Prouty Heights lots were reported on his income tax return for the appropriate year. On their 1957 income tax return petitioners reported the receipt of $37,571.24 from the sale of Prouty Heights lots and on their 1958 return reported an additional $20,518.94, bringing the total of the payments received as shown by the return for the two years to $58,090.18. In arriving at the gain on the sales as reported on the return, the cost as reflected on the 1957 return was in the amount of $34,662.92 and on the 1958 return $47.50, bringing the total cost to Moss of the Prouty Heights lots to $34,710.42 and the gain realized as $23,379.76. No explanation is offered as to the $5,165.18 margin by which the $58,090.18 received in the two years exceeded the $52,925 which Northern was obligated to pay for the 29 lots purchased by it. The $34,710.42 reported on the two returns as the cost of the Prouty Heights *151 lots sold purportedly represented their actual cost to Moss, including the purchase price of the land, the cost of building and surfacing the roads, the cost of installation of drainage, water mains and hydrants, and any other incidental costs. Based on the returns it is our conclusion that by some date in 1958 the $52,925 or $1,825 per lot for the 29 lots had been fully paid, whether the payments were made under the mortgage provision for release of any or all of the lots upon the payment of $1,000 per lot with the remainder representing the payment of second mortgages accepted by Moss in the interim in payment of the balance of $825 per lot, or according to some other method of payment acceptable to and agreed upon by the parties. We have carefully examined and considered all of the evidence of record and the facts derived therefrom, bearing upon the value of the note and mortgage herein, including the description of the property, its development step by step, transactions covering the sale, the mortgages given and the obligations of the parties, as well as the testimony of the petitioner's three expert witnesses and of the expert witness called by the respondent. It is our opinion *152 that the fair market value of the $48,925 note of Northern dated December 17, 1956, secured by mortgage of the same amount and date delivered by Northern to petitioner in payment of the balance of the purchase price of the 29 Prouty Heights lots was $24,000 when received and we have so found as a fact. Sherwood Forest Sherwood Forest was made up of two contiguous tracts of undeveloped land, one of approximately 40 acres and the other of about 35 acres, and were purchased by Moss at a cost of $15,000 each. One tract 1141 of approximately 40 acres, sometimes referred to as the Avramides land, was acquired on May 4, 1955, and the other of about 35 acres, sometimes referred to as the MacIver land, was acquired on September 19, 1955. In the instrument of conveyance of the Avramides tract to Taylor as straw man the description of the land was vague and indefinite in that it merely recited boundary lines with no measurements. The boundary lines were described or denoted by the naming of the properties adjoining it on each of its sides. In contrast, in the deed conveying the MacIver land to Taylor the metes and bounds were set forth in detail and were specific both as to monuments *153 and measurements. The deed by which Ruth Nicholl conveyed the MacIver land to Taylor recited that it had been conveyed to her by deed of the Town of Burlington dated March 26, 1946. According to the testimony of Moss the MacIver land "was tax title land and defective." As to the Avramides land it was his testimony that at the time he acquired it, it had no access except through a questionable right of way which was involved in litigation. "* * * knowing what was going on in the town as to the growth, being on the Planning Board, Town Council and writing reports for the Planning Board on the future growth of the town," he bought the Avramides property because he "knew that it would be worth some money." Since the Avramides land had no undisputed access, he entered into negotiations for the purchase of the adjoining MacIver land, which fronted on a main road, and concluded its purchase some four months after the purchase of the Avramides tract. Including the two tracts of land within one perimeter Moss promptly initiated proceedings, Land Court case 26214, for registration of the said land under the Massachusetts procedures for land registration and to resolve any boundary or title *154 problems. On some date not shown, but in any event prior to July 18, 1956, he had had the two tracts divided into 124 lots. There were thereafter three sales of Sherwood Forest lots wherein notes secured by mortgages on the lots sold were delivered either in full payment of the purchase price of the lots or, where some amount had been paid at or prior to conveyance, in payment of the balance of the purchase price. It is the fair market value at the time of delivery of these notes, secured by the said mortgages, which is in issue herein. The first of the notes was a note for $135,200 executed and delivered by Redmond on November 2, 1956, in payment for 79 lots in the Avramides portion of Sherwood Forest. The second such note was that of Ciardiello in the amount of $9,000, executed and delivered on November 21, 1956, to cover the balance of the $10,800 purchase price of six lots located in the MacIver portion of Sherwood Forest. The third was the note of Ciardiello in the amount of $19,800, executed and delivered under date of May 10, 1957, in payment of the purchase price of 11 lots also in the MacIver portion of Sherwood Forest. Relying on the testimony of his two expert witnesses *155 it is the contention of the petitioner that with respect to each of the three sales of lots the note and mortgage received in payment therefor had no fair market value when received. The first of these witnesses rested his opinion to that effect on several considerations as to some of which some comment may be helpful. Based on the proposition that there was a proceeding to register title to the Sherwood Forest tract because of a defect, it was his opinion that that fact alone would render the notes and mortgages unmarketable and of no value when received. Also, he was of the opinion that the obligation of Moss as seller to bear the development costs for the lots sold as required by the Burlington Planning Board was of such magnitude as also to render the notes and mortgages unmarketable and of no value when received. And, as a factor in rendering the notes and mortgages of no marketable value, he regarded the three mortgages herein as one mortgage having a face value of $164,000 and as being a third mortgage rather than a first or second mortgage and that there is "[No] market rate at all on a third mortgage." It is true that the registration proceeding initiated by Moss, after *156 acquiring the Avramides and MacIver tracts and dividing them into 124 lots, had not been concluded when the sales to Redmond and Ciardiello were made and the notes and mortgages herein were delivered in payment for the lots sold. The difficulties with the boundaries and measurements of the Avramides property when acquired by Moss were, we think, patent on the face of the deed of conveyance 1142 by Radiches to Taylor. As we have already noted, however, in the deed conveying the MacIver land to Taylor the metes and bounds were set forth meticulously and in detail and were specific both as to monuments and measurements and the claim with respect to the defect in the title to the MacIver land comes from the testimony of Moss to the effect that it was "tax title land and defective." It is true that the deed whereby Ruth Nicholl as straw man for MacIver conveyed the land to Taylor does show that the land had been conveyed to her under date of March 26, 1946, by deed of the Town of Burlington, which deed was recorded in the Middlesex South District Registry of Deeds. Moss did not elaborate as to what would be required to clear the title of the MacIver land springing from the fact *157 that it was tax title land, but there is no suggestion or claim of any defects in its boundaries or measurements. Assuming, however, that some nine years after it was conveyed by the Town of Burlington to Ruth Nicholl and its conveyance to Taylor was accepted by him the title was still defective because it was "tax title land," we have found nothing of record, even persuasive, that the curing of the defect would be much if anymore than a formality, or that such a defect in title was in any way responsible for the delay in completing the land registration proceeding. In that connection we are not overlooking the stated conclusion of Moss, in the course of his testimony at the further hearing herein, that an error in one portion of the tract "would throw the lots off throughout the whole tract, and is still going on." Continuing his testimony he stated that at that time there remained about 20-odd lots yet to be "finished," indicating, we think, that the clearing of title to the lots did not have to await the entering by the Land Court of its final order but that the lots were "finished" lot by lot. This conclusion, we think, finds corroboration in the fact that the construction, building *158 and sale of houses on the lots sold were not being retarded or postponed by whatever defects may have remained as to the individual lots in the Sherwood Forest tract still to be "finished," even though some of the lots on which houses had been built and sold comprised or were among the lots still to be "finished," with the purchasers as the substituted petitioners in the Land Court proceeding. Nor are we overlooking the fact that as to some Sherwood Forest lots difficulties were encountered in procuring the necessary financing therefor and that this difficulty was overcome when Moss gave Provident Institute of Savings his personal guarantee to complete the land registration proceedings. On the other hand, the Chelsea Savings Bank apparently experienced no title difficulties as to the 11 lots sold by Moss to Ciardiello when, after the conveyance of the lots by Moss to Ciardiello on May 10, 1957, it took a mortgage thereon from Ciardiello just prior to the execution and delivery by Ciardiello to Moss of the note and mortgage with which we are here concerned. It is to be noted also that as to the 22 of the Redmond lots reconveyed to Moss on July 15, 1958, which lots were from the Avramides *159 portion of Sherwood Forest, the occasion for the reconveyance was not because of any defect in title but because the lots were so low that building permits could not be obtained. As for the development of the lots as required by the Planning Board regulations, which according to the testimony of the witness included "the installation of the water mains, water services, storm draims, drainage structures, valves, excavation to sub-base, gravel, and the installation of a road," the witness, if we understood him aright, made his estimate of the total cost of the required development for the entire Sherwood Forest tract, namely for the entire 124 lots, and then combining the three mortgages herein as one mortgage of $164,000 concluded that the three mortgages combined were burdened by such total cost of development for the tract as estimated by him, that such combined mortgage would be a third mortgage, and for that reason and for the further fact that his estimated cost of development, namely $159,200, would for practical purposes be equal to the face amount of the assumed third mortgage none of the three mortgages herein would have any marketable value when delivered as security for *160 the payment of the three notes. At this point it may be noted that it was the opinion of petitioner's third expert witness that the "cost of developing" the Sherwood Forest tract "as required by the mortgages" would have been $190,095. We also note at this point that there is no evidence as to the cost which was actually incurred by Moss in doing this said development work. 1143 It is to be recalled that Moss, according to his testimony, started the work of developing the land by construction of roads and installation of water mains, hydrants and the like as required by the Planning Board at or about the time of his negotiations with Redmond for the purchase of lots in the Avramides portion of Sherwood Forest. There is no evidence or claim that he discontinued such work until his obligation therefor was completely satisfied. Patently, some portion of the work as it related to the 79 lots sold to Redmond remained to be done by Moss as the seller at the time of the conveyance of the 79 lots to Redmond and the execution and delivery of the note and mortgage in payment therefor, inasmuch as the mortgage itself carried a provision whereby he, as mortgagee, was obligated to complete *161 "the roads and water in accordance with the requirements of the Burlington Planning Board" and to install the hot top "from Cambridge Street along Nelson Road through Lot 10 and along Holly Street to Robinhood Lane." The record is silent as to the extent to which such work had been completed when the note and mortgage were executed and delivered to him. Similarly, we find nothing of record to indicate the ratable part of the total development work which remained to be done to complete the job and satisfy Moss' obligation as mortgagee. In the case of the six lots sold to Ciardiello, the agreement of sale similarly indicates that the work of development had not at that time, namely, October 15, 1956, been completed in that it was provided in the agreement that "[Seller] agrees to comply with Planning Board requirements for the development of the lots and the buyer may withhold THREE HUNDRED DOLLARS ($300.00) per lot until the hot top is installed." It is to be noted, however, that on November 21, 1956, some 37 days later, when the six lots were conveyed, the $9,000 note made and delivered and the mortgage securing its payment was executed, the only such burdening provision included *162 by the parties in the mortgage had to do with the installation of the hot top and was to the effect that "[Mortgagor] may withhold the sum of THREE HUNDRED DOLLARS ($300.00) on each lot until the hot top is installed on the roads in accordance with the requirements of the Burlington Planning Board." Such being the case, we do not regard it as beyond the realm of probability that nothing further was required of Moss as mortgagee in the development of the six lots pursuant to the Planning Board requirements other than the installation of the hot top as set forth in the mortgage. Turning to the 11 lots conveyed to Ciardiello on May 10, 1957, the facts show that an option for their purchase had been granted to Ciardiello as a part of the October 15, 1956, agreement whereunder Moss agreed to sell Ciardiello the six lots above, and with respect to the lots covered by the option it was recited that "[Seller] agrees to complete the installation of the water mains and hydrants and the hot top for the roads, as required by the Burlington Planning Board. Buyer may withhold the sum of THREE HUNDRED DOLLARS ($300.00) for each lot as security for the installation of the hot top." It is to *163 be noted, however, that neither the requirement on the part of the seller to complete the installation of the water mains and hydrants and the hot top for the roads pursuant to the requirements of the Burlington Planning Board nor the authorization for the buyer to withhold $300 per lot as security for installation of the hot top was carried into the mortgage executed on May 10, 1957, as security for the $19,800 note given as of the same date in payment for the 11 lots. There is no evidence and in fact we have found no contention that the absence from the mortgage of such requirements on the mortgagee was not because both the mortgagor and the mortgagee were of the view that the obligation of Moss as seller with respect to those items had already been satisfied when the note and mortgage were given. It thus appears, we think, that the expert witness in arriving at his opinion that the notes and mortgages were worthless by reason of the obligation of Moss to perform the work described in satisfaction of the development requirements of the Burlington Planning Board gave no thought or consideration as to whether or not, or the extent to which, the work had been done and Moss' obligation *164 as seller had already been satisfied at the time the particular note and mortgage were executed and delivered. It stands to reason, we think, that an interested buyer of the respective mortgages as of the dates received by Moss would have been very much interested in learning just how much of the development costs remained to be done for which under the mortgage the mortgagee would be liable. We are also satisfied that in such event 1144 Moss in negotiating the sale of the mortgage or mortgages would have hastened to inform the prospective purchaser as to the amount of the work already completed for which the purchaser as mortgagee would not thereafter be liable, to the end that there be no discount therefor in selling price of the note and mortgage. However the Redmond mortgage of $135,200 may have been regarded by the witness in his rationalization processes whereby he reached the conclusion that the mortgage was of no market value, the mortgage itself shows that the parties, namely, Redmond and Moss, regarded it as being subject only to the mortgage from Taylor to Radiches of a date not shown. We are not advised as to the face amount of that mortgage or the unpaid balance *165 as of the date of execution by Redmond of the mortgage herein in favor of Moss. But, the only obligation, of which we are advised, that Moss ever had to Radiches was for $15,000 representing the purchase price of the 40 acre Avramides tract. The mortgage was shown as recorded in the Middlesex South District Registry of Deeds and the information as to the original face amount of any unpaid balance thereon on November 2, 1956, when the mortgage with which we are concerned herein was executed, could have been made available by petitioner to his expert witness either from the mortgage as recorded or from his own accounts. And, most certainly any interested buyer of the instant mortgage would have been advised not only as to the face amount of the mortgage to Radiches but as to whatever amounts remained to be paid. As for the instant mortgage it was, as executed and delivered, not subordinated to any mortgage except the mortgage to Radiches. As to any or all of 63 specified lots it would to the extent of $800 per lot permit the mortgagor to substitute for the instant mortgage a "second mortgage" which, having regard for Radiches' mortgage, might appear to make third mortgages of the $800 *166 so-called second mortgages. It is to be noted, however, that no $800 "second mortgage" could arise as to any lot unless prior payment of $1,000 had been made on the purchase price of each such lot which with the said $800 made up the entire purchase price per lot. In other words, there could be no further mortgage, whether it be termed a second or third mortgage, of $800 per lot until the instant mortgage had been satisfied to the extent of $1,000 per lot for each lot. As to the remaining 16 lots the mortgagor did have the privilege of obtaining partial release of the said lots from the instant mortgage by executing and delivering to the mortgagee a "second mortgage" for $21,800 without any prior payment per lot and he could obtain a complete release from the instant mortgage or the "second mortgage" on a per lot basis by paying $1,362.50 per lot for each of the said 16 lots. It would thus appear that in such circumstances the $21,800 "second mortgage" would be subordinated to the instant mortgage as well as the mortgage to Radiches. As for the $9,000 Ciardiello mortgage, the mortgage itself indicates that both the mortgagor and mortgagee regarded it as a first mortgage when it *167 was executed and delivered as security for the payment of Ciardiello's $9,000 note of the same date. These lots were from the MacIver portion of Sherwood Forest and there is no showing that it was subject to any prior mortgage. It did contain a provision whereunder on specified conditions it could be reduced to a second mortgage status for $800 per lot, or $4,800 for the six lots, but that could occur only after the mortgagor had paid $700 per lot, or $4,200 for the six lots, on the note and mortgage. When that was done Ciardiello was entitled to make payment of the remaining $800 per lot, or $4,800 for the six lots, in the form of a second mortgage. The $19,800 mortgage executed by Ciardiello on May 10, 1957, as security for the payment of the $19,800 note of the same date, by its provisions makes it subject only to "a prior first mortgages [sic] to Chelsea Savings Bank by mortgagor herein" which mortgage was noted as duly recorded in the Middlesex South District Registry of Deeds. It is true that the amounts and terms of the prior first mortgage or mortgages to Chelsea Savings Bank are not set forth in the May 10, 1957, mortgage to Moss, which omission was cited by the second *168 of petitioner's expert witnesses as supporting his opinion that the instant mortgage was of no market value when received. That information was of course available in the mortgage or mortgages as recorded in the registry of deeds and from Moss himself. Apparently the petitioner did not undertake to supply it or to make it of record herein. 1145 We are not advised with respect to the prior first mortgage or mortgages to the Chelsea Savings Bank beyond what has been noted above from the May 10, 1957, mortgage. A prerequisite to the making of such a mortgage by Ciardiello to the bank would be the conveyance of the 11 lots by Moss to Ciardiello and it goes without saying that the making of a mortgage senior to the mortgage to be delivered to Moss as security for the note given in payment for the lots could not have been effected without the prior consent of Moss as the seller of the lots. A reasonable surmise, we think is that the permission to make such mortgage or mortgages was to assist Ciardiello in procuring construction money, but, as stated, that is only a surmise. It is not reasonable, in our opinion, to conclude or surmise that the amount of the mortgage or mortgages *169 so permitted by Moss was or were such as would in his opinion render the note, for which the mortgage was given as security, of no value. Moss, according to his own testimony, was one of the best, if not the best, informed man with respect to the real estate developments in the Burlington area. He was, in our opinion, too sophisticated in such matters to go beyond what he regarded as helpful to the purchaser without endangering the payment of the $19,800 for which he had sold the lots. The second of petitioner's expert witnesses, as did the first, expressed the opinion that a defect in title to land on which mortgage had been given would alone be sufficient to render the mortgage unmarketable and of no value, and based on the proposition that there was a defect in the title to the lots covered by the three sales from the Sherwood Forest tract he expressed the opinion that the three mortgages and the notes which they secured were, when received, of no value. We have discussed the defect of title factor above and no useful purpose would be served by repeating it here. He was of the same conclusion where "the mortgage has a subordination" which as he explained is a situation where *170 a mortgage may be subordinated to another mortgage. He was of the view that in such circumstances the mortgage which has "a subordination" would be unmarketable and worthless if the mortgagor should be fortunate enough to place a new first mortgage for an amount beyond the value of the parcel or tract of land so mortgaged. He did not relate, at least not clearly, the situation described to any of the mortgages here. Suffice it to say, what we have said above as to the terms of the three mortgages in our discussion of the testimony of the first expert witness is, as we view it, apropos on this point and further discussion is not needed or necessary. It was also the testimony of this witness that a mortgage by a corporation, though signed by a duly authorized officer, would have "no marketable value" where there was no personal endorsement by an individual. And since the first of the three mortgages covering the purchase of Sherwood Forest lots was executed by Redmond Fahnley, Inc. and the other two were executed by G. Ciardiello & Sons, Inc., and none had personal endorsements, the mortgages in his opinion had no marketable value. On cross-examination, however, he explained that in *171 such testimony he was confusing mortgages with corporate notes. And, strange as it may seem, no one of the five notes at issue herein was placed in evidence nor, aside from this witness, has anyone indicated any interest as to just how they were signed. It is the contention of the respondent that on the facts of record the notes did have very substantial fair market value when received and the values were in the amounts testified to by his expert witness and he does not now contend that the value was equal to face value of the notes as originally claimed. It was the opinion of the witness that the fair market values of the respective notes when received by Moss were as follows: Redmond note, $91,750; first Ciardiello note, $5,700; and the second Ciardiello note, $15,840. While we are firmly convinced that the evidence of record and the facts derived therefrom do clearly substantiate the opinion of the witness that the notes and mortgages herein did have substantial value when received and were not worthless and of no value as contended by the petitioner and testified to by his expert witnesses, we are unable to find and conclude that the values were as shown by the opinions expressed *172 by him. Various of the facts of record relied on by petitioner's expert witnesses as the basis for their opinions of no fair market value are pertinent in determining the fair market value of the notes and mortgages when received and while we do not regard them as being sufficient to sustain their 1146 opinions of no value we are satisfied and convinced that when given the weight they should receive they lead us to conclusions of fair market values lower than those testified to by respondent's expert witness. Some portion of the Sherwood Forest development was at a lower level in the water shed than other ground nearby or adjacent and we think that it should have been reasonably apparent at and prior to the execution and delivery of the note and mortgage by Redmond that there might be occasions when an above average flow or accumulation of surface water could result with respect to some of the lots. We also note that each of the mortgages carried a provision that the conveyance of the lots thereunder was made "subject to easement for drainage and easement by Colonial Beacon Oil line." Accordingly, there is in the facts known at the time the note and mortgage were given some *173 indication that water problems above normal might be encountered in the building of the roads and the installing of drainage facilities. The evidence, we think, shows that such problems were encountered with respect to at least some of the lots sold to Redmond, although the petitioner did not see fit to demonstrate how the actual cost he did incur compared with the anticipated or estimated cost at the time the note and mortgage were received. In fact, as previously noted, we find nothing of record showing the amount of the costs which were actually incurred by Moss for the development work. On the other hand, we have no direct evidence that any of Ciardiello's problems, whatever they may have been, had to do with the flow or accumulation of surplus water. The evidence further disclosed that Redmond also encountered a problem of providing the proper drainage for some of the lots he had acquired from Moss and that the basements of some of the houses built on the land flooded. According to Moss this was the result of exceedingly heavy rain in 1957 or 1958. It developed that some of the lots were so low that building permits could not be obtained and though we have found no specified *174 condition in the Redmond transaction requiring Moss to assure that building permits would be issued to Redmond, Redmond under date of July 15, 1958, did reconvey 22 such lots to Taylor, which reconveyance Taylor accepted. We have examined and to the best of our ability considered and weighed all of the evidence of record and the facts derived therefrom, including the testimony of petitioner Moss, the expert witnesses called by him and that of the expert witness called by respondent, and it is our opinion and conclusion that the fair market value of the Redmond note for $135,200 given on November 2, 1956, in payment for the 79 Sherwood Forest lots was $45,000 when received by Moss and we have found as a fact that the fair market value of the note on that date was in that amount. Similarly, with respect to the $9,000 Ciardiello note given on November 21, 1956, in payment for six lots in Sherwood Forest, it is our opinion and conclusion, and as shown in our findings of fact we have so found, that the fair market value of the note on that date was $4,500. With respect to the $19,800 note given by Ciardiello on May 10, 1957, in payment for 11 Sherwood Forest lots, it is our opinion *175 and conclusion, and as shown in our findings of fact we have so found, that the fair market value of the note on that date was $9,500. Reciting that the Commissioner formally determined, as reflected in the deficiency notes, that each of the "five mortgages in issue had a fair market value, when received, equal to the full face amount of the respective mortgages" and at the trial submitted "only" the testimony of one witness who gave as his opinion that "each of the mortgages had a fair market value at the time each was given to Moss substantially less than the face amount of each such mortgage," conclusively establishing that the "Commissioner's determination regarding the fair market value of each of the mortgages was erroneous," petitioners, on brief, argue that, "once it is established that the deficiency is erroneous, the presumption of correctness attaching to the Commissioner's determination disappears, and the burden then is on the respondent to establish the correct deficiency." In support of the proposition stated, the petitioners cite Helvering v. Taylor, 293 U.S. 507; Hoffman v. Commissioner, 298 F. 2d 784; Federal National Bank v. Commissioner, 180 F. 2d 494; *176 Welch v. Commisioner, 297 F. 2d 309; and Tex-Penn Oil Co. v. Commissioner, 83 F. 2d 518. 1147 It is our opinion that the contention is not soundly made and Marcello v. Commissioner, 380 F. 2d 499, 507, affirming on this point a Memorandum Opinion of this Court, and Fada Gobins, 18 T.C. 1159, affirmed per curiam, 217 F. 2d 952, are dispositive of the question here. In Marcello v. Commissioner, the Court said: The Commissioner's determination shifts the burden of going forward to the taxpayer. After the taxpayer produces his evidence, the Commissioner may elect to produce no rebuttal evidence, being content that the taxpayer has not shown the Commissioner's determination to be erroneous. The Tax Court is then free to reach its decision on the basis of whether the entire record indicates that the Commissioner's determination was in error. The Tax Court will consider two factors in making its decision: (1) that the Commissioner's determination at the beginning of the proceedings was presumed to be correct, and (2) that the burden of proof at the close of the proceedings still remains with the taxpayer to establish *177 the Commissioner's errors by a preponderance of the evidence. We find that the Tax Court ably and correctly performed its task. Decision will be entered under Rule 50. Footnotes
1. Certain Findings of Fact relating to the issue involved appear in the Findings of Fact in T.C. Memo. 1966-29↩ but for clarity and convenience in considering and disposing of the said issue will also appear herein.
2. With respect to Burlington it was his testimony that it is a matter of public record that the Town of Burlington grew from a population of 2,500 in 1953 to 18,000 in 1964 and that it has had the greatest percentage growth of any community in America since 1953. It was his further testimony that as a member of the Planning Board during the period of rapid growth he "was responsible for most of it."↩
3. As to the issuance of the Dasal stock to Sarah Moss, it was the testimony of Moss "that we have divided our properties so that wherever possible, she can own about half during her lifetime and I about half."↩
4. According to the testimony of Moss, the Wood Hill property was transferred to Taylor in the course of liquidating Dasal Corporation, which had been dissolved by Court order on September 23, 1953, for failure to file certificates of condition, but by virtue of the Massachusetts statute contrnued to exist for another three years to liquidate its business.↩
5. No copy of the plan dated August 12, 1957, was introduced in evidence or made a part of the record.↩
6. Presumably, in keeping with the February 15, 1958, sales agreement Leeland as buyer of the Wood Hill land had been substituted as petitioner in the Land Court registration Case No. 26399.↩
7. The lots covered by this sales agreement were numbered 4 through 33, except that there was no listing of any lot numbered 11. Presumably, Booker had bought lots 1, 2 and 3 but, if so, either there was no lot 11 or if there was it was not included in the agreement of the sale to Northern.↩
8. On the copy of the October 30, 1956, sales agreement as it appears of record the remainder of this paragraph is not legible. The concluding words of a comparable paragraph of the underlying mortgage given later as security for the note given in payment for the 29 lots are, "receipt of a second mortgage and note of $825 with interest at 5 percent per annum for the balance due on each lot."↩
9. There was no down payment at the time the agreement of October 30, 1956, was executed. The note and mortgage were for only $48,925 as compared with the sales price of $52,925 for the lots according to the sales agreement. And since the sales agreement did appear to indicate that the $52,925 was to be paid at the time of conveyance partly in cash and the remainder by note, there being no contention to the contrary, it is reasonable to assume, we think, that the $4,000 was paid in cash along with the delivery of the note.↩
10. In so far as appears the note had been delivered to Moss on December 17, 1956, the date it bore.↩
11. It was the testimony of Moss that the 40-acre tract actually belonged to one Avramides, the father of Argyro J. Radiches, and that she held title to the land for her father.↩
12. It was the testimony of Moss that the registration had not been completely concluded as of the date of his testimony herein and that there were about "20-odd lots that had not yet been finished."↩
13. The record is in a confused state as to the payment of the $3,500. The parties have stipulated that the lots were deeded to Redmond on August 16, 1956, "and a mortgage taken back by * * * Moss, as shown by Exhibit 51-YY." The mortgage, Exhibit 51-YY, is dated November 2, 1956, not August 16, 1956, and it covers 79 Sherwood Forest lots later sold to Redmond and does not cover or mention lots 1 and 55.↩
14. The mortgage referred to in the next sentence was by Redmond Fahnley, Inc. to Jack J. Moss and signed by William H. Redmond as president. It does not appear of record whether Redmond Fahnley, Inc. was the nominee of William H. Redmond, Jr. or succeeded to his interests, but for the purposes herein the parties appear to treat the interests of William H. Redmond, Jr. and Redmond Fahnley, Inc. as one and the same and we will at times continue to refer to the purchaser as Redmond.↩
15. From a map placed in evidence it would appear that most, if not all, of Nelson Road, which connected with Cambridge Street, "a main road," was through the MacIver portion of Sherwood Forest.↩
16. It was the testimony of Moss that he bought the 40 acres of Avramides land for $15,000. The amount of the mortgage given back is not shown, and except for the above reference in the Redmond mortgage we have failed to find any reference to a mortgage from Taylor to Radiches covering all or a part of the Avramides land. The above mortgage from Taylor to Radiches was shown as recorded in the Middlesex South District Registry of Deeds.↩
17. We have found no explanation as to the prior first mortgage or mortgages to the Chelsea bank by the "mortgagor herein" and we can think of none unless it was that Moss permitted Ciardiello to give the said "prior first mortgage" for construction money.↩
18. Sec. 1.1001-1. Computation of gain or loss. (a) General rule. - Except as otherwise provided in subtitle A of the Code, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent, is treated as income or as loss sustained. The amount realized from a sale or other disposition of property is the sum of any money received plus the fair market value of any property (other than money) received. The fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no fair market value. * * *↩